CITY OF BOSTON, petitioner.

Suffolk.    May 18, 1915. — June 22, 1915.

Present: RUGG, C. J., LORING, DE COURCY, CROSBY, & PIERCE, JJ.

*Bridge. Chelsea Bridge. Boston. Chelsea. Revere. Constitutional Law. Municipal Corporations. Supreme Judicial Court. Contract,* What constitutes. *Words,* "Maintenance."

St. 1911, c. 581, as amended by St. 1913, c. 341, empowering the Supreme Judicial Court to appoint a commission to apportion among the cities and towns which receive special benefits from the Chelsea Bridge, the Meridian Street Bridge and the Chelsea Street Bridge a joint and equitable share of the cost of construction, reconstruction, repairs and maintenance of those bridges and to assess

upon any street railway having a location thereon a just and equitable share of the cost of construction and repairs, is constitutional, not being a delegation of legislative powers to the judicial department of the government, but conferring upon the court a judicial or *quasi* judicial duty and power.

It is within the constitutional power of the Legislature to impose upon one city or town a part of the expense of erecting or maintaining a bridge within the limits of another city or town.

The facts that, under the provisions of Sts. 1911, c. 581; 1913, c. 341, the entire management of the operation of Chelsea Bridge is vested in the city of Boston and that the commission to be appointed thereunder was given power to assess upon the city of Chelsea and the town of Revere a portion of the cost of such operation, while somewhat novel, do not make the statutes unconstitutional.

The word "maintenance" in §§ 1, 3 of St. 1911, c. 581, relating to the apportionment by a commission to be appointed by the Supreme Judicial Court of the cost of construction, reconstruction, repairs and maintenance of certain bridges, includes "operation" and therefore it is within the power of such commission to apportion the cost of operating such bridges in accordance with the provisions of that statute and of St. 1913, c. 341.

A steel conduit over filled land may constitute a part of a single bridge, another part of which spans the mouth of a navigable river; and therefore the finding of the commission appointed under Sts. 1911, c. 581; 1913, c. 341, to apportion the cost of construction, reconstruction, repairs and maintenance of Chelsea Bridge, among others, that that bridge extends from the navy yard in Charlestown to Chelsea is warranted although the middle section consists of a steel viaduct built on masonry piers over railroad tracks constructed on filled land.

It was within the power of the Legislature to authorize by St. 1913, c. 341, § 1, the commission appointed under St. 1911, c. 581, § 1, to apportion the cost of the construction of a certain bridge which then had not been built.

The facts that, after negotiations between the cities of Boston and Chelsea looking toward the assumption by one or the other of the entire duty of maintenance and expense of the north draw of Chelsea Bridge, which by St. 1878, c. 41, was to be equally divided between them, the city council of Boston and the mayor and aldermen of Chelsea passed orders authorizing the mayors of the respective cities to enter into an agreement whereby Boston should assume the entire expense of such repair and maintenance "forever" in consideration of the payment by Chelsea of $25,000; that thereafter by St. 1880, c. 159, § 1, it was provided that, upon such payment of $25,000 by Chelsea to Boston "it shall thereupon be the duty of the city of Boston to forever maintain and keep in repair the northeasterly draw and draw-piers of Chelsea Bridge, and also such portion of the bridge as may be included within the piers when relocated;" that thereafter, without the making of any agreement in writing, Chelsea paid to Boston $25,000, and Boston repaired and maintained the draw at its sole expense up to the passage of St. 1911, c. 581, do not constitute a contract which "exists between the city of Boston and the city of Chelsea, which" under St. 1911, c. 581, § 5, "prevents the carrying out of this act in any part."

St. 1880, c. 159, above referred to, was a governmental regulation of the north draw of Chelsea Bridge as it then existed, and its provisions were subject to modification or repeal according to the wisdom of the Legislature. St. 1911, c. 581, § 5, did not transform that regulation into a contract.

The fact that the city of Boston widened that draw from thirty-two to fifty feet in 1895, and in 1899 widened it further to sixty feet and, without raising any

question as to an apportionment of the expense thereof, continued to pay the entire expense of construction, repair and maintenance up to the enactment of St. 1911, c. 581, does not affect the true interpretation of St. 1880, c. 159, as relating only to the draw as it existed in 1880.

PETITION, filed in the Supreme Judicial Court on September 13, 1912, under St. 1911, c. 581, and St. 1913, c. 341, for the appointment of commissioners for the apportionment of the expenses incurred by the construction and maintenance of Chelsea Bridge, Meridian Street Bridge and Chelsea Street Bridge.

Chapter 581 of St. 1911 is as follows:

"Section 1. Upon the application of the city of Boston, after a vote thereupon by its city council, to any justice of the Supreme Judicial Court, and after notice to and hearing of the cities of Boston and Chelsea, the towns of Revere and Winthrop, and such other cities and towns and street railway corporations as are affected by the application, said court shall appoint three disinterested persons as commissioners, neither of whom shall reside in either of said cities or towns, who, after notice and a hearing, shall apportion among the cities and towns which receive special benefits from the bridges hereinafter named a just and equitable share of the cost of construction, reconstruction, repairs and maintenance of said bridges, and shall also assess upon any street railway having a location upon any of said bridges a just and equitable share of the cost of construction and repairs: provided, however, that no costs shall be so assessed for any work done or contracted for previous to the passage of this act. Said bridges are, (1) Chelsea bridge, so-called, between Charlestown and Chelsea; (2) Meridian Street bridge between East Boston and Chelsea; (3) Chelsea Street bridge between East Boston and Chelsea.

"Section 2. Said bridges, or any of them, or any authorized substitute for any of them, shall be constructed or repaired by the city of Boston when appropriations therefor have duly been made by its city council, and the city of Boston is hereby authorized and empowered to collect from the cities, towns and street railway companies aforesaid the amounts apportioned to them by said commission, on application to the Supreme Judicial Court or any justice thereof, or to the Superior Court or any justice thereof, and said courts shall have jurisdiction in equity or otherwise to enforce said payments.

"Section 3. After such construction or repairs said bridges shall be maintained by such cities or towns as are now by law responsible for their maintenance, but said commission may, under the provisions of section one, decide what, if any, cities or towns shall contribute to said maintenance and in what proportions, and the Supreme Judicial and Superior Courts shall have jurisdiction in equity or otherwise to enforce the payment thereof.

"Section 4. Such parts of sections eight and nine of chapter twenty of the Revised Laws as are inconsistent herewith, chapter one hundred and sixty-five of the acts of the year eighteen hundred and ninety-four, and all other acts or parts of acts inconsistent herewith are hereby repealed.

"Section 5. If any contract exists between the city of Boston and the city of Chelsea which prevents the carrying out of this act in any part, such contract shall not be impaired by this act, and if the Boston and Northern Street Railway Company, formerly the Lynn and Boston Railroad Company, and the Chelsea and Boston Railroad Company have any rights in the present Chelsea bridge which must as a matter of law exist in any new structure, such rights shall not be affected by this act.

"Section 6. This act shall take effect upon its passage."

Chapter 341 of St. 1913 is as follows:

"Section 1. The board of three commissioners heretofore appointed by the Supreme Judicial Court to apportion the cost of construction, reconstruction, repair and maintenance of certain bridges named in chapter five hundred and eighty-one of the acts of the year nineteen hundred and eleven is hereby authorized to apportion the percentage of the cost of the work done and to be done, and also to apportion and assess the percentage of the cost of maintenance and repairs provided in said act to be apportioned and assessed, and may report its apportionment to the Supreme Judicial Court notwithstanding that certain items of such cost may remain unascertained and unpaid at the time of filing the report. The report, when accepted by said court, shall be a final adjudication of all matters referred to the commissioners, and shall be binding on all the parties.

"Section 2. The said commissioners shall receive such sums for their services and for their necessary expenses, including stenographers' charges for making reports of hearings, as may be allowed

by the Governor and Council; and the amounts so allowed shall be added to and made a part of the cost to be apportioned under the provisions of said chapter five hundred and eighty-one.

"Section 3. This act shall take effect upon its passage."

Dana Malone, Esquire, Samuel C. Bennett, Esquire, and Albert P. Worthen, Esquire, were appointed commissioners. After the filing of their report and of a supplementary report, the material portions of which are described in the opinion, the city of Boston made the motion, described in the opinion, for a confirmation of the report. The case was reserved by *Carroll, J.*, for determination by the full court.

The case was submitted on briefs.

*J. P. Lyons*, for the city of Boston.

*L. R. Kiernan*, for the city of Chelsea.

*A. A. Casassa*, for the town of Revere.

RUGG, C. J. This is a petition under St. 1911, c. 581, as amended by St. 1913, c. 341, for the appointment of commissioners for the apportionment of the expenses incurred by the construction and maintenance of certain bridges connecting parts of Boston and Chelsea. Commissioners were appointed, who have filed an original and a supplemental report. The case was reserved by a single justice on a motion made by the city of Boston for the confirmation of this report, except in a single particular referred to hereafter.

These statutes authorize the city of Boston to construct and repair Chelsea Bridge between Charlestown and Chelsea, Meridian Street Bridge between East Boston and Chelsea, and Chelsea Street Bridge between East Boston and Chelsea. The last named bridge is not here involved. These statutes then authorize the appointment of a commission by the Supreme Judicial Court with power to "apportion among the cities and towns which receive special benefits from the bridges . . . a just and equitable share of the cost of construction, reconstruction, repairs and maintenance of said bridges." The commission have reported that Chelsea Bridge consists of three parts: 1, Chelsea Bridge south, extending from the Navy Yard to the Mystic flats or Mystic Wharf, spanning the south channel of the Mystic River; 2, the central part, which is a steel viaduct, extending over what formerly were flats partly above and partly below low water level,

lying between the two channels of the Mystic River, which have been filled and are now used as a freight terminal; and 3, Chelsea Bridge north, extending from the flats to Chelsea and spanning the north channel of the Mystic River.  There is a draw in both the north and south parts.  The commission determined that Revere, Chelsea and Boston receive special benefit from Chelsea Bridge and assessed certain percentages both of construction and maintenance on each of these municipalities.  The commission determined that Boston and Chelsea alone receive special benefit from the Meridian Street Bridge and made apportionment of certain percentages of its cost and maintenance upon these two cities.

1.  The constitutionality of these acts is attacked on several grounds.  Certain general principles as to this branch of the law are well settled.

The cities and towns of the Commonwealth are public corporations established by the Legislature for the convenient administration of government.  In the furtherance of this end the extent and character of the burdens which may be imposed on them within the bounds of reason rest in the sound judgment of the General Court and are determined by its conception of the requirements of the public good.  It is within the power of the Legislature to enact that a particular bridge shall be constructed or taken and established as a public highway and that its initial cost as well as the expense of its maintenance and operation shall be paid by counties, cities and towns named in the statute or selected, as being specially benefited, by commissioners appointed by the court. This is not a delegation of legislative powers to the judicial department of government and hence is not obnoxious to the provision of the Constitution which prohibits such delegation.  Declaration of Rights, art. 30.  The apportionment of the burden of providing for bridges over navigable waters with the necessary draws well may be thought to require a more elaborate and careful investigation than could be given by the Legislature itself or by one of its committees.  The apportionment of expenses arising from public improvements like these among the several municipalities receiving special benefits therefrom in such manner as to be just and equitable to all interests involves the ascertainment of facts which according to common usage best can be reached by the hearing of evidence and of arguments.  Difficult questions

of law might arise in the course of such an inquiry. Its investigation and decision is appropriate for a judicial tribunal. In its general characteristics the proceedings and the questions to be decided pertain to the exercise of the judicial faculty. It is plain from our previous decisions that by statutes similar to those here challenged the Legislature does not undertake to require the court to exercise legislative or executive, but only judicial or *quasi* judicial functions. *Salem Turnpike & Chelsea Bridge Corp.* v. *County of Essex,* 100 Mass. 282. *Agawam* v. *County of Hampden,* 130 Mass. 528, 530. *Scituate* v. *Weymouth,* 108 Mass. 128. *Kingman, petitioner,* 153 Mass. 566.

2. It is urged that these statutes confer legislative power to the extent of leaving to the commission appointed by the court a free field in the selection of the municipalities specially benefited and not confining them to a particular county or district. This is not a decisive factor. The principle established is a just and reasonable apportionment among those specially benefited. This involves an inquiry judicial in its nature. Naturally the number receiving a peculiar advantage above the general improvement is small. The whole subject in this respect may be left to the commissioners where the basis of apportionment established by the statute is one which requires the exercise of the judicial faculty and does not involve by its conclusion alone the repeal of statutory provisions. There is nothing inconsistent with this result in *Boston* v. *Chelsea,* 212 Mass. 127. Indeed, it there was said (page 130): "The ascertainment of the cities and towns deriving special and peculiar benefits from a designated public improvement has been left by the Legislature to the determination of commissioners appointed by this court . . . in numerous instances."

Although the cities and towns upon which an assessment for costs and expenses closely resembling those at bar may be levied frequently have been restricted to those in certain named counties or districts, there are many statutes where no such limitation has been made whose constitutionality has not been doubted. See, for example, Sts. 1868, c. 322, § 2; 1869, c. 266, §§ 1, 2; 1870, c. 265, § 2; 1875, c. 200, § 3.

3. It is within the constitutional power of the Legislature to impose upon one town a part of the expense of erecting or maintaining a bridge within the limits of another town. *Commonwealth*

v. *Newburyport*, 103 Mass. 129. The same rule applies·to counties. *Carter* v. *Cambridge & Brookline Bridge Proprietors*, 104 Mass. 236.

4. The circumstance that the entire management of the operation is vested in Boston and that Chelsea and Revere are required to contribute to such expense, although somewhat novel, is not unconstitutional. The practical advantages, for example, of placing unlimited responsibility for the operation of the north draw of the Chelsea Bridge in one municipality instead of dividing it between two is obvious. In its constitutional aspects it does not differ from requiring contribution from other cities and towns toward the cost of a bridge built and maintained by a corporation or a municipality. *Brayton* v. *Fall River*, 124 Mass. 95. *Northampton Bridge Case*, 116 Mass. 442. See Sts. 1870, c. 265, § 2; 1869, c. 266, § 5. This does not relate to matters which are in the past, but it looks wholly to the future. In principle the proposition is no different from that of vesting in an independent board the control of a public project to the expense of which numerous cities and towns must contribute. See *In re Metropolitan Park Commissioners*, 209 Mass. 381, 385. The appropriate municipal officers of Boston in effect are constituted a public board to repair, maintain and operate the bridge. There is nothing in *Hampshire County* v. *Franklin County*, 16 Mass. 76, and *In re Flatbush*, 60 N. Y. 398, relied upon by the town of Revere, inconsistent with this conclusion. No attempt here is made to appropriate any money from one municipality for the benefit of another or to pay the debts of another as in those cases.

5. The contention that the statute makes no provision for the apportionment of the expense of operating the draws of the bridges cannot be supported. The bridges span navigable waters. Doubtless no permit could have been obtained from the United States for their construction had no adequate provision been made for the draws. The word "maintenance" in §§ 1 and 3 of St. 1911, c. 581, when applied to the subject matter to which it relates, is of signification broad enough to include the operation of the draws. See *Plimpton* v. *New York, New Haven, & Hartford Railroad, post*, 548.

6. It is argued that no part of the cost incident to the construction, maintenance or repair of the part of the bridge over the Mystic flats can be apportioned upon any other municipality than

Boston, because it does not constitute in truth part of the Chelsea Bridge. But the commission has reported that this bridge extends from the navy yard in Charlestown to Chelsea. This appears to accord with the legislative purpose as manifested by earlier statutes. The Mystic flats have been filled to constitute a freight terminal. This section of the bridge consists of a steel viaduct, built on masonry piers over the railroad tracks. The contention is that this is not a bridge but a viaduct, and *Swanzey* v. *Somerset*, 132 Mass. 312 is relied on. But it is apparent that this position is untenable in view of the report by the commission. A steel conduit over filled land may constitute a part of a single bridge another continuous part of which spans the mouth of a navigable river.

7. No part of the work of building the Chelsea Bridge across the south channel has been done, no contract has been made and no appropriation has been voted, but the undertaking has been entered upon to the extent of commencing work upon a temporary bridge for use while the permanent structure is being built. The objection that no apportionment of expense to be incurred for this part of the bridge can be made until it is constructed is not sound. An apportionment under these circumstances can be made legally before the work is completed and without knowing the exact amount to be expended. The apportionment is expressed in percentages which can be applied to the total when ascertained. These points are covered by *Kingman, petitioner*, 153 Mass. 566, 584, and *Adams, petitioner*, 165 Mass. 497, 499. Such apportionment expressly is authorized by St. 1913, c. 341, § 1.

The statutes here attacked are not vulnerable in any constitutional aspect.

8. It is provided by St. 1911, c. 581, § 5, that "If any contract exists between the city of Boston and the city of Chelsea which prevents the carrying out of this act in any part, such contract shall not be impaired by this act." The facts to which this section relates as reported by the commission are that the boundary line between Boston and Chelsea is the centre of the north channel of the Mystic River. By St. 1878, c. 41, the north draw of the Chelsea Bridge (constructed under St. 1872, c. 185, and reconstructed under St. 1876, c. 106) was required to be maintained and repaired equally by Boston and Chelsea. Soon after the enactment of the latter statute negotiations were begun between the two cities

looking toward the assumption of this whole duty by one or the other city. These culminated in an order by the city council of Boston authorizing the mayor to enter into an agreement to repair and maintain the northerly draw and piers of Chelsea Bridge and such portion of the bridge as may be included within the piers, forever, in consideration of the payment by the city of Chelsea to the city of Boston of the sum of $25,000, and in the passage of a similar order by the mayor and aldermen of Chelsea authorizing the mayor to enter into a similar agreement binding the city of Boston to the same obligation as to repair and maintenance in return for $25,000 paid it by the city of Chelsea. Upon petition of the mayor of Boston the Legislature passed St. 1880, c. 159, section one of which provided that "Upon the payment of the sum of $25,000 by the city of Chelsea to the city of Boston, it shall thereupon be the duty of the city of Boston to forever maintain and keep in repair the northeasterly draw and draw-piers of Chelsea Bridge, and also such portion of the bridge as may be included within the piers when relocated." There is no evidence that any agreement in writing was executed between the two cities. In May, 1880, $25,000 was paid by Chelsea to Boston, and thereafter to the time of the passage of St. 1911, c. 581, the city of Boston repaired and maintained the draw at its sole expense

These arrangements between the two cities, in the end not expressed by a formal written document but made effective through the instrumentality of a statute, do not constitute a contract. They relate to a public work for the convenience of general travel.

It is familiar law that the laying out, construction and maintenance of highways, bridges and other conveniences or necessities for travel and for the transportation of persons and commodities, is a public function. Bridges may be built and maintained by the State, by counties, by municipalities or by special districts, or by one or more of these in combination with others, all as may be determined from time to time by the General Court. Legislative power is not exhausted by a single exercise, but may be put forth at any time in any reasonable way in furtherance of the general public good. If conditions change so that a shifting of the burden of the expenses becomes desirable in connection with the construction or maintenance of highways for travel, it is within the power of the Legislature to make such change. The various cities and towns

of the Commonwealth are territorial subdivisions established by the Legislature for convenience in the administration of government. So far as they are charged with the performance of governmental duties and the building of edifices and structures for public use in the execution of governmental duties, they are public agencies and do not acquire therein a private right or property interest free from legislative control. Their existence may be terminated at any time and the property devoted to strictly public uses may be transferred to other governmental agencies for continued public use. They are liable at any moment to have their public powers, duties, rights and property modified, divided, combined or alienated by the Legislature.

The establishment, maintenance and repair of highways always has been recognized as a strictly public duty and not a private obligation of cities and towns. It is not of consequence what may be the particular kind of highway, using the word in its generic sense, whether roadway, ferry, tunnel or subway. They are all public enterprises. When constructed out of public moneys, they do not possess the common attributes of private investments. Bridges come within the same principle.

St. 1880, c. 159, therefore, was simply a governmental regulation touching a highway. It established no contractual relation whatsoever. It conferred no property rights upon either municipality in the constitutional sense of being protected against legislative change. It was an act of legislation and not the making or the recognition of a compact. Being a governmental regulation it was subject to modification or repeal according to the wisdom of the Legislature. *Springfield* v. *Springfield Street Railway,* 182 Mass. 41. *Worcester* v. *Worcester Consolidated Street Railway,* 182 Mass. 49; *S. C.* 196 U. S. 539. *Higginson* v. *Treasurer of Boston,* 212 Mass. 583. *Browne* v. *Turner,* 176 Mass. 9. *East Hartford* v. *Hartford Bridge Co.* 10 How. 511, 533, 534. *Commonwealth* v. *Plaisted,* 148 Mass. 375, 386.

The reference in St. 1911, c. 581, § 5, quoted above does not transform the pre-existing regulation into a contract. It was inserted doubtless as a precaution, so that if on investigation it should be found that a contract existed, it should be preserved. It goes no further than this

It therefore is necessary to interpret St. 1880, c. 159, and St. 1911,

c. 581, § 5, as statutory regulations of public affairs and not as the establishment or recognition of private contracts. The provision is that through the payment of $25,000 by Chelsea to Boston it thereupon should become the duty of Boston "To forever maintain and keep in repair" the northeasterly draw and the draw-piers of Chelsea Bridge, and also such portion of the bridge as may be included within the piers when relocated. The fair construction of its words is that it applied and was intended to apply chiefly to the bridge then under consideration and not to every subsequent bridge built under a new statutory provision. The draw then in being and the space between the draw-piers about to be relocated was the subject to which the attention of the Legislature specifically was directed. It cannot be presumed that it was intended to operate through all time as to new structures built under new authority, the cost of maintaining and operating which might be much greater. The necessities of navigation through a draw in any bridge at this place might change vastly with the advancement of the art of transportation on water. The needs of travel over the bridge by the invention of new instrumentalities of journeying by land in the interval since 1880, as well as the great increase of population, presented in 1911 a problem quite different from that of thirty-one years before. Words susceptible in some connections of being interpreted as meaning until time shall be no more hardly could have been intended to have that signification when used with reference to a present contribution of a gross sum toward the maintenance of a structure so liable as a bridge with a draw over tidewater to fall into uselessness through decay or the advancement in the science of bridge building or the necessities of the public as to accommodation of travel by water or on the bridge through changing civilization. The subject matter speaks strongly of temporal affairs and fleeting conditions. All the circumstances point to a single then present structure or possibly to its successor built without new statutory authority if that could be done, to continue also until the Legislature again might deal with the subject. It would have been simple to use words which would have imposed on Boston the perpetual obligation at its sole expense to maintain, construct and reconstruct from time to time forever successive bridges with draws suitable for all public requirements, so long as a bridge might be needed at this place. That was not done.

The ruling of the commission that St. 1880, c. 159, was not applicable to the construction of the new draw was right. But its further ruling that it applied to the cost of repairs and maintenance was wrong. When an entirely new structure was built under the authority of a new statute the statutory law as to the old structure naturally would be abrogated, except so far as retained expressly or by implication. The report of the commission is that in 1895 the north draw in the Chelsea bridge was rebuilt so as to increase the width of the roadway from thirty-two to fifty feet and the waterway from forty-four to forty-five feet, and again in 1899 so as to increase the width of the waterway from forty-five to sixty feet, all by Boston, and that no portion of the cost either of construction or maintenance was sought from Chelsea. This was an interpretation placed by the municipalities upon the statute, plainly in accord with St. 1880, c. 159, up to 1895. Doubtless that statute would continue to be effective until the Legislature passed some new act touching the matter. But in any event the conduct since 1895 is so recent that there is no room for the application of the rule that a course of dealing continued for many years may afford presumptive evidence of an original agreement, illustrated in *Cambridge* v. *Lexington*, 17 Pick. 222. The meaning of the statute of 1880 being that its rule of expense should continue until the Legislature again passed a statute about the subject, the course of conduct between the two cities since 1895 has slight significance.

The result is that the motion of the city of Boston should be granted and the report of the commission be confirmed, except as to the cost of the repairs and maintenance of Chelsea Bridge north; and that as to such repairs and such maintenance the alternative finding of the commission as to apportionment should be substituted; and that, as thus modified, the report should be confirmed. A decree is to be entered accordingly.

*So ordered.*