904 P.2d 1252

**JOHN E. SHAFFER ENTERPRISES, an Arizona Corporation, individually and on behalf of all citizens of the City of Yuma, similarly situated, Plaintiff–Appellant,**

v.

**CITY OF YUMA, a political subdivision of the State of Arizona, Defendant–Appellee.**

**No. 1 CA–TX 93–0003.**

Court of Appeals of Arizona, Division 1, Department T.

May 9, 1995.

Review Denied Oct. 24, 1995.

---

8. This court must follow a decision of the Arizona Supreme Court. *State v. McShine*, 131 Ariz. 485, 487, 642 P.2d 482, 484 (App.1982).

Richard D. Engler, Yuma, for plaintiff-appellant.

Steve Moore, Yuma City Atty., Hunt, Stanley & Hossler by Douglas Stanley, Yuma, and Gust Rosenfeld by Fred H. Rosenfeld, Phoenix, for defendant-appellee.

## OPINION

LANKFORD, Presiding Judge.

John E. Shaffer Enterprises, Inc. (Taxpayer) brought an action seeking to require the City of Yuma to stop imposing intergovernmental service charges against two city budget units funded by certain limited-purpose sources. Taxpayer appeals from an adverse judgment based on a tax court determination that it failed to sustain its burden of proof at trial. We have jurisdiction pursuant to Ariz. Rev.Stat.Ann. (A.R.S.) section 12–2101(B).[1]

The pertinent facts are as follows. In April 1970, the voters of the City of Yuma amended Article III, Section 72 of the Yuma City Charter by special election to grant the City the right to assess, levy and collect excise taxes on the privilege of engaging in business. As approved by the voters, Section 72 provided in pertinent part:

> Such taxes may be computed upon, but shall in no event exceed an amount equal to one percent (1%) of gross proceeds of sales, gross income or gross proceeds, except that, for the sole purpose of the acquisition, construction, maintenance and promotion of public facilities to consist of a baseball complex, an 18–hole golf course, and a multi-purpose community center building, and necessary and appropriate

1. The appeal is assigned to Department T of this court pursuant to A.R.S. sections 12–120.04(G) and 12–170(C).

service and administrative facilities appurtenant thereto, such taxes amounting to an additional two percent (2%) of the gross proceeds of sales or gross income from the businesses of restaurants, bars, hotels and motels (as such businesses shall be defined) may be likewise imposed, such additional taxes to terminate upon complete payment of the costs of acquisition and construction of such facilities.

Later, in budget year 1978–79, the City of Yuma instituted an intergovernmental service charge (IGSC)[2] and applied it against funds of the convention center and golf course constructed pursuant to Yuma City Charter Article III, Section 72. In 1985–86 the City extended the IGSC to encompass the associated baseball complex.

Also in the 1978–79 budget year and thereafter, the City of Yuma received allocations of highway user revenue funds from the State of Arizona pursuant to A.R.S. section 28–1595. The Arizona Constitution provides that monies allocated from the Arizona Highway User Revenue Fund to incorporated cities are

to be used by them solely for highway and street purposes including costs of right-of-way, acquisitions and expenses relating thereto, construction, reconstruction, maintenance, repair, roadside development, of county, city and town roads, streets, and bridges and payment of principal and interest on highway and street bonds....

Ariz. Const. art. IX, § 14. In budget year 1978–79, the City of Yuma began to impose an IGSC against highway user funds received by its street maintenance department.

Taxpayer is an Arizona corporation which has conducted business as a bar within the limits of the City of Yuma. Taxpayer has paid the two percent sales tax authorized by the 1970 charter amendment, together with license fees, taxes and other fees constituting highway user revenues. In January 1991 it filed a special action complaint challenging the legality of the City's IGSC's against the Yuma recreation complex and against the Yuma street maintenance division.

Taxpayer's challenge was tried to the tax court over six days. Taxpayer argued that the IGSC was an unauthorized expenditure of sales tax revenue and of highway user revenue funds. According to Taxpayer, sales tax revenue cannot be used for overhead and can be used only to pay interest and principal on the bonds and to pay for maintenance and promotion of the facility. Taxpayer similarly contended that highway user revenue cannot be used for overhead and can only be used for the construction or maintenance of physical assets utilized in public transportation. Furthermore, Taxpayer claimed that the means by which these allocations were made were arbitrary and illegal because they did not conform to generally accepted accounting principles.

The tax court denied the special action relief. It held that the burden was on Taxpayer to prove its position and that Taxpayer had not met its burden. The court reasoned that for Taxpayer to prevail, it had to prove that the IGSC excessively allocated expenses: "While the method of allocation used by the City of Yuma may have been something less than what appears in accounting textbooks, there was no proof made that the allocation resulted in an excessive charge to the subject departments." The tax court also held that both the applicable charter and ordinance of the City of Yuma and the Arizona Constitution authorize expenditures to cover any costs—including overhead—necessary to the purposes of the funds.

Taxpayer raises two issues on appeal:

(1) Did the tax court err in assigning to Taxpayer the burden of proving that the City had misallocated limited-purpose funds to overhead expenses?

(2) Did the tax court err in determining that the City could allocate revenue generated by the transaction privilege tax and funds from the Arizona Highway User Revenue Fund to overhead expenses?

I.

We first consider the burden of proof issue. Taxpayer contends that once it had

2. In general, the City's IGSC is intended to reimburse the City's general fund for interdepartmental services that support the specially-funded budget units against which the charges are made.

shown that the City lacked a "rationally based methodology that accurately and reliably identified such costs," the City had the burden of producing evidence that it had not charged excessive overhead expenses against the sales tax and highway funds.[3] Taxpayer's theory is that the City was a trustee for municipal taxpayers and that under general principles of trust law the City had the duty to account in detail for the restricted funds it took in and paid out, including the payee and purpose of each disbursement. Taxpayer argues that because the City did not do so, Taxpayer was entitled to prevail as a matter of law.

■ Taxpayer, not the City, had the burden of proof. Generally, the party who asserts the affirmative of an issue has the burden of proving it. *Black, Robertshaw, Frederick, Copple & Wright, P.C. v. United States*, 130 Ariz. 110, 634 P.2d 398 (App. 1981). Here, Taxpayer asserts the misuse of funds and Taxpayer bears the burden of proof on the issue.

■ Moreover, the authorities on which Taxpayer relies do not support its trust theory. 74 AM.JUR.2D *Taxpayers Action* section 16 (1974), quoted in part by Taxpayer, merely uses a trustee analogy as an alternative explanation for the general principle that taxpayers have standing to seek to enjoin misapplications of municipal funds. While a municipality may be a trustee for standing purposes, it does not function as a trustee for all purposes.

Taxpayer also cites Arizona authority in asserting that a trust relationship exists between the taxpayer and the municipality. *See Ethington v. Wright*, 66 Ariz. 382, 189 P.2d 209 (1948) (equitable ownership principles that permit taxpayers to seek to enjoin waste or illegal expenditure of municipal funds permit same type of proceedings for state taxpayers concerning state funds); *Smith v. Graham County Community College District*, 123 Ariz. 431, 600 P.2d 44 (App. 1979) (taxpayer's right to bring an action to question illegal expenditures by public agen-

cy may be based on the taxpayer's equitable ownership of the funds and his liability to replenish the public treasury for deficiencies caused by misappropriation); and *Dail v. City of Phoenix*, 128 Ariz. 199, 624 P.2d 877 (taxpayer seeking a declaration that a municipal contract was invalid and an injunction to restrain official action does not have automatic standing). However, these cases rely on the principles of equitable ownership to give taxpayers standing to sue and do not broadly hold that the government is generally subject to all of the duties owed by a trustee. Indeed, in *Dail* we stated: "[A]bsent fraud or other compelling circumstances, to have standing *a taxpayer must be able to demonstrate* a direct expenditure of funds that were generated through taxation, an increased levy of tax, or a pecuniary loss attributable to the challenged transaction of a municipality. *See generally* 74 AM.JUR.2D *Taxpayers Action* § 4 (1974)." (Emphasis added). 128 Ariz. at 202, 624 P.2d at 880 (App.1980). These authorities do not support Taxpayer's attempt to impose the burden of proof on the City as a trustee.

■ Furthermore, assuming the City is a trustee for accounting purposes, taxpayer still bears the burden of proof under traditional trust law. Quoting RESTATEMENT (SECOND) OF TRUSTS § 172 cmt. b (1959), Taxpayer claims that

> *If the trustee fails to keep proper accounts*, he is liable for any loss or expense resulting from his failure to keep proper accounts. The burden of proof is upon the trustee to show that he is entitled to the credit he claims, and his failure to keep proper accounts and vouchers may result in his failure to establish the credits he claims.

(Emphasis added). According to the RESTATEMENT, the burden shifts to the trustee only if he fails to keep proper accounts. Keeping proper accounts does not require the trustee to justify the reasonableness of each transaction; it merely requires the

---

**3.** The tax court determined that Taxpayer's evidence did not demonstrate that any of the IGSC's to the Streets Maintenance Department or the Yuma recreation complex exceeded the reasonable value of operating and overhead services. Taxpayer does not challenge that determination on appeal.

trustee to maintain proper records of the transactions. *See Neel v. Barnard,* 24 Cal.2d 406, 150 P.2d 177 (1944) (When accounting for trust, trustee has burden to establish correctness of his accounts; but, plaintiff who sues trustee for fraud and malfeasance still holds burden of proving his charges). By challenging the process used by the City to determine the amount of the IGSC, Taxpayer questions the reasonableness of the IGSC charged.

■ Generally, a beneficiary seeking to obtain relief for a breach of trust must prove that a fiduciary duty existed, the trustee failed to perform that duty, and the court should grant the requested relief. GEORGE GLEASON BOGERT & GEORGE TAYLOR BOGERT, TRUSTS AND TRUSTEES § 871, at 123–24 (2d ed. 1981). If the beneficiary seeks damages, he must prove that the breach caused him a loss. *Id.* at 124. Only after the beneficiary shows a prima facie case will the burden shift to the trustee. *Id.*

Accordingly, we hold that the tax court did not err in finding that Taxpayer had the burden of proof and failed to meet that burden.

## II.

Taxpayer next contends that it was entitled to judgment because, as a matter of law, neither the funds generated by the Arizona Highway User Revenue Fund nor those received from the two percent special sales tax for the recreation complex could permissibly be used for any kind of overhead expenses or operating and administrative costs.

Under Section 72 of the Yuma City Charter, the special sales tax revenues were to be used for "the acquisition, construction, *maintenance and promotion* of public facilities" consisting of a baseball complex, a golf course, a community center building, and appurtenant service and administrative facilities. (Emphasis added). The tax was to terminate "upon complete payment of the costs of acquisition and construction of such facilities." Taxpayer claims that the voters were led to believe that the monies raised by the tax would be spent only to procure a physical plant and structure and maintain

them until the cost of their acquisition and construction was paid. Therefore, according to Taxpayer, the Yuma City Charter did not authorize the City to use any of the special sales tax revenues to defray overhead, administrative or operating expenses by means of an IGSC.

Taxpayer argues that the common meaning of the words "maintenance" and "promotion" do not include operating or overhead expenses. *Webster's Third New International Dictionary* (G. & C. Merriam & Co. 1969) defines "maintenance" in part as:

**2a:** the act of providing means of support for someone <the small man looked to his neighboring lord for a protection and ~ which the state could not give—W.C. Dickinson> **b:** the provisions, supplies, or funds needed to live on: means of sustenance ... **4:** the labor of keeping something (as buildings or equipment) in a state of repair or efficiency: CARE, UPKEEP <the mere ~ of the fences ... gives much to do—Richard Jefferies> ...

*Id.* at 1362. Moreover, *Webster's* defines "operating" as: "**1:** engaged in some form of operation: FUNCTIONAL ... *esp*: engaged in active business (as manufacture, transportation, merchandising) ..." at 1581. Costs incurred "keeping something in a state of repair or efficiency" are analogous to those incurred keeping something "functional."

■ The City charter provision authorizing expenditures of the revenues for "maintenance and promotion" of these public facilities is enough to encompass operating and overhead expense. For example, payroll clerks are employees of the City who process the paychecks of all City employees, including promotion and maintenance workers. By processing the paychecks of the workers who promote and maintain the recreational complex, the payroll clerks perform an essential function that allows the recreational complex to operate. Therefore, if the City may charge the Special Sales Tax Fund for the salary of the employees who send out fliers for the convention center or perform maintenance work on the recreational complex, then it should also be able to charge the fund for the work of those who prepare the salary checks.

■ The same reasoning applies to the Highway User Revenue Fund. The Arizona Constitution, Article IX, Section 14, provides that funds distributed from the Arizona Highway User Revenue Fund to municipalities are to be used

> solely for highway and street purposes including costs of right-of-way, acquisitions and expenses relating thereto, construction, reconstruction, maintenance, repair, roadside development, of county, city and town roads, streets, and bridges and payment of principal and interest on highway and street bonds....

However, the enumeration of specific purposes in Section 14 does not circumscribe the more general restriction to expenditures for "highway and street purposes." Op.Atty. Gen. I92–004, 1992 WL 456602 (May 15, 1992). Rather, the listed categories are among those included within the statement of the general purpose. Highway user revenues may fund any activity that promotes such "highway or street purposes" even if the activity does not fall within one of the enumerated categories. *Id.*

Taxpayer contends that general administrative and operating costs do not fall within a "highway or street purpose." However, courts have generally held otherwise. In *State ex rel. King County v. Murrow,*[4] 199 Wash. 685, 93 P.2d 304 (1939), the court held that a county could spend highway funds to maintain ferries. It also held that "maintenance" as used in a highway statute was a broad term, sufficient to encompass operating costs such as the purchase of marine insurance for the boats. The court stated:

> We must first ascertain what is meant by *maintenance* of roads. It has been held that the phrase "maintenance of public roads" is not restricted literally to the manual labor of repairing existing roads. The phrase has a broader meaning and includes the doing of everything necessarily and appropriately connected with and incidental to the laying out, opening, and the construction of public roads and the maintenance of an efficient road system.

93 P.2d at 307 (quoting *Crow v. Tinner,* 47 S.W.2d 391, 392 (Tex.Civ.App.1932), *aff'd Tinner v. Crow,* 124 Tex. 368, 78 S.W.2d 588 (Com.App.1935) (holding it within constitutional provision for the maintenance of roads to reimburse officials for costs of operating their private vehicles to supervise road work)). Similarly, the court in *In re City of Boston,* 221 Mass. 468, 109 N.E. 389 (1915), *app. dism. sub nom. City of Chelsea v. City of Boston,* 245 U.S. 626, 38 S.Ct. 10, 62 L.Ed. 517 (1917), held that the authorization for the funding of the "maintenance" of a bridge was broad enough to include the operation of the bridge draws.

■ If an expenditure furthers "highway or street purposes," then it is permitted by the Arizona Constitution. Accordingly, the crucial question for determining whether an activity may be funded by the highway user revenues is not *who* performed the activity but whether the activity in fact promotes highway or street purposes. For example, the Department of Development Services, Administration Division, is responsible for planning and zoning, building safety, and engineering. Within this department, the Public Works section is responsible for the maintenance of water and sewer lines; this section is also responsible for the maintenance of streets. Similarly, the Materials Management Division is the City's purchasing division. It purchases all items needed by the City, including shovels, asphalt, gravel, sand, uniforms and other items needed to build and repair streets. Therefore, IGSC's should be chargeable against the Highway User Revenue Fund to pay part of the salaries of the employees of the Department of Development Services, Administration Division, and the Material Management Division to the extent that their work supports the maintenance, repair or construction of highways and streets.

■ Furthermore, if the Constitution allows the City to utilize highway revenue funds for building or leasing offices and other facilities necessary for the construction of highways and streets,[5] then surely the City

4. Cited with approval in Op.Atty.Gen. I84–087, 1984 WL 61299 (June 20, 1984).

5. Highway user revenues may be used to construct county highway offices, storage buildings,

may spend the funds for the same purpose by obtaining the same facilities from another department of the City. If the City pays the fair value for the premises, there is no practical distinction between the two situations. The expenditure is in the same amount and for the same purpose. Therefore, we conclude that the constitutional provision authorizes reimbursement transfers of highway user funds to any municipal department that actually performs operational and overhead support furthering "highway and street purposes."

For the foregoing reasons, we affirm the decision of the tax court.

NOYES and GARBARINO, JJ., concur.

garages, appurtenances, fencing, and other related facilities, so long as they are directly related to the purposes of Ariz. Const. art. IX, § 14.

Op.Atty.Gen. I84–087, 1984 WL 61299 (June 20, 1984).