# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 124

**OCTOBER TERM, A.D. 2016**

**December 22, 2016**

TAMRA ACORN, REBECCA SHWEN, and
FEDERER HOLDING COMPANY, LLC, a
Wyoming close limited liability company,

Appellants
(Defendants),

v.

LORI MONCECCHI and DINO MONCECCHI,

Appellees
(Plaintiffs).

No. S-16-0099

REBECCA SHWEN and the MARGIE JEAN
FEDERER REVOCABLE TRUST OF JUNE 29,
1988, As Amended and Restated,

Appellants
(Defendants),

v.

LORI MONCECCHI and DINO MONCECCHI,

Appellees
(Plaintiffs).

No. S-16-0100

LORI MONCECCHI and DINO MONCECCHI,

Appellants
(Plaintiffs),

v.

TAMRA ACORN, REBECCA SHWEN,   No. S-16-0101
FEDERER HOLDING COMPANY, LLC, a
Wyoming close limited liability company, and the
MARGIE JEAN FEDERER REVOCABLE TRUST
OF JUNE 29, 1988, As Amended and Restated,

Appellees
(Defendants).

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Tamra Acorn, Rebecca Shwen, and Federer Holding Company, LLC in*
*Case Nos. S-16-0099 and S-16-0101:*
    John M. Walker, Robert J. Walker, and Autumn A. Aspen of Hickey & Evans,
    LLP, Cheyenne, Wyoming.  Argument by Mr. John Walker.

*Representing Rebecca Shwen and the Margie Jean Federer Revocable Trust in Case*
*Nos. S-16-0100 and S-16-0101:*
    Alexander K. Davison of Patton & Davison, Cheyenne, Wyoming.

*Representing Lori and Dino Moncecchi in Case Nos. S-16-0099, S-16-0100, and S-16-*
*0101:*
    Weston W. Reeves and Anna M. Reeves Olson of Park Street Law Office, Casper,
    Wyoming.  Argument by Mr. Reeves.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.
Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building,
Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be
made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]    During the course of their marriage, M. W. "Bud" Federer (Bud) and Margie Federer (Margie) amassed a sizeable estate, predominantly comprised of apartment complexes throughout Wyoming. The Federers formed numerous entities to manage their holdings for their benefit during their lives, and for the benefit of their three daughters. As so often happens, the parents' attempt to impose harmony along with the assets they conveyed to the next generation was unsuccessful. The sisters disagreed about money, and those disagreements blossomed into accusations of misconduct and breaches of the duties that attach to their roles as trustees and LLC managers. The sisters filed claims, counterclaims, and cross-claims, which the district court sorted out after a bench trial. We affirm the district court's ruling in part, and reverse and remand in part.

*ISSUES*

[¶2]    In addition to the question of jurisdiction, which this Court raises on its own, the parties raise numerous issues, which we consolidate and restate below.

1.    Does this Court have jurisdiction to entertain the parties' appeals, or must we dismiss because the Judgment is not a final appealable order?

2.    Was the district court's conclusion that Dino Moncecchi did not breach his fiduciary duties to Federer Holding Company, LLC, by not soliciting bids from competitive property management companies or by appropriating business opportunities for Spartan, clearly erroneous?

3.    Was the removal of Rebecca Shwen as trustee of the Margie Jean Federer Revocable Trust based on findings that were clearly erroneous?

4.    Did the district court incorrectly apply the burden of proof for establishing damages resulting from Rebecca's breach of fiduciary duty?

5.    Did the district court abuse its discretion when it awarded attorney fees against Rebecca for filing a frivolous claim?

*FACTS*

[¶3]    Bud enjoyed a successful career as a businessman in Wyoming. He and his wife, Margie, had three daughters: Rebecca, Lori, and Tamra.[1]  Bud died in 2003. Margie was diagnosed with Alzheimer's disease and has not been able to manage her affairs since at least 2010. In April of 2011, Margie moved to the Aspen Wind assisted living facility

---

[1] We use first names to avoid confusion.

1

where she receives round-the-clock care. During Bud's life, and after he died, the family created a number of entities to hold and manage their business interests and to pass Bud and Margie's estate to their daughters and their families. The current dispute concerns three of those entities: Spartan Management, LLC (Spartan), Federer Holding Company, LLC (FHC), and the Margie Jean Federer Revocable Trust (MJFRT). The Margie Jean Federer Marital Trust (Marital Trust) also plays a role.

## I.    *Spartan, FHC, and the apartment complex management*

[¶4]    The Federer family assets include nine low-income apartment complexes located throughout Wyoming. These apartments were or are managed in accordance with the United States Department of Housing and Urban Development (HUD). Each apartment complex operates as a separate limited liability partnership and is owned by various Federer trusts and other parties and entities.

[¶5]    Spartan was formed in 1972 to manage these apartment complexes. In 1993, Bud hired Dino Moncecchi to work for Spartan. Dino is married to Lori, the Federers' middle daughter. Spartan became an LLC in 1995, and Dino became its manager. Over time, Dino and Lori received Spartan ownership interests as compensation and purchased additional interests. At the time of the trial, the Moncecchis owned 65 percent of Spartan, and the Marital Trust owned the other 35 percent. The three Federer sisters are equal beneficiaries of the Marital Trust.

[¶6]    FHC was created in 2006 to serve as the general partner of the partnerships owning the apartment complexes and to "provide continuity of management and liability protection," as noted by the attorney who set up FHC. FHC acquired a one percent interest in each of the apartment entities. The Moncecchis, Rebecca, and Tamra each own a one-third interest in FHC.

[¶7]    Prior to 2006 (when FHC was formed), Spartan managed the apartment units pursuant to separate contracts with the various apartment entities. Because he had been managing the apartment complexes for the family as the manager of Spartan and in order to provide continuity to HUD, Dino was appointed the sole manager of FHC when it was formed and continued in that capacity until this litigation.

[¶8]    After the formation of FHC and under Dino's management, Spartan continued to manage the apartment complexes as it always had. The fees charged by Spartan were established by the original HUD contracts sometime between 1972 and 1995, and have not been changed, except as required by HUD in 2000 for five of the complexes that were in its Mark-to-Market program. Dino never sought competitive bids for the management of the properties. Dino testified that a typical property manager would perform the tasks of leasing, maintenance, rent collection, and bill payment. He contrasted that service with the service that Spartan provides, which includes typical management undertakings,

2

along with additional services such as conducting long-term needs assessments, negotiating insurance coverage and claims, reviewing audits, and other more far-reaching activities like working with governmental regulatory agencies and the legislature.

[¶9] Spartan also owns laundry facilities in each of the apartment complexes, which were installed when the properties were constructed. Spartan owns and maintains the washers and dryers but pays the apartment owners about $15,000 per year to rent the laundry facilities. Dino testified that the laundry facilities generate a total of approximately $40,000 to $50,000 in annual income for Spartan.

## II. The MJFRT, loans to Tamra, her husband and their companies, the Moncecchi loan, and Rebecca's conduct as trustee

[¶10] The MJFRT is a trust established by Margie. Margie was originally the trustee, but in 2010, her three daughters, Rebecca, Lori, and Tamra, succeeded her. In December 2010, Lori and Tamra resigned as co-trustees, leaving Rebecca as the sole trustee of the MJFRT. There was extensive evidence at trial regarding Rebecca's conduct as the trustee of the MJFRT. We limit our discussion of that evidence to the facts relevant to the issues presented on appeal.

### A. Loans to Tamra, her husband and their companies

[¶11] When Margie was the trustee of the MJFRT, she occasionally made loans from the trust to her children and their spouses. The trust provides that in the event such loans are not repaid, the principal outstanding will be deducted from that heir's distribution of the trust assets upon Margie's death.[2] From 2000 to 2005, Margie made six loans (collectively referred to as the Acorn debt) to Tamra and her husband, David (the

---

[2] The MJFRT provides:

> I have made some loans to my daughters, my daughters and their spouses, the spouses of my daughters, and businesses owned by my daughters, my daughters and their spouses, or my daughter's spouses during my life. The promissory notes for these loans are held by this Trust. I direct that my Trustees offset the unpaid principal of the promissory notes owed this Trust by a daughter, a daughter and her spouse, a daughter's spouse, or a business owned by a daughter, a daughter and her spouse, or a daughter's spouse against the trust shares to be distributed to the daughter. Such offset shall be accomplished by distributing the promissory notes to the daughter and considering the unpaid principal of the notes as part of or all of her trust shares. If the unpaid principal of the promissory notes is greater than the value of the daughter's trust shares, the daughter or her descendants shall not be required to pay the difference to the Trust.

3

Acorns), and entities owned by them.[3]  The Acorns made no payments on two of the loans and made very few payments on the other four.  The last payment on two of those loans was made in 2004; on another in 2005, and on another in 2009.  As of December 2010, the amount outstanding on all six loans totaled $1,202,079 ($881,360 principal and $320,719 interest).

[¶12]  In November 2010, the three sisters, Dino, and their family attorney, Mr. Leonard, met to discuss the Acorn debt and the tax implications to the MJFRT of declaring the debt uncollectible.[4]  Mr. Leonard summarized their discussion in his November 12, 2010 letter:

> With the significant potential for estate tax on Margie's death, we discussed the necessity of having the debts owed to Margie's trust by David and Tammy and their business entities declared uncollectible and written off to reduce the value of Margie's estate and thereby reduce the potential estate tax that could be payable upon her death.

As a result of decisions made at the meeting, the MJFRT sent demand letters to the Acorns for each loan seeking payment in full of the outstanding debt and providing that if no payment was made in response, the debt would be considered uncollectible or collateral pledged would be attached.  Five of the six demand letters also informed that if the debt was declared uncollectible, "the offset of the unpaid principal" on the loans "against Tami's share of the Margie Jean Federer Revocable Trust will not be affected, and her trust share at the time for distribution will be reduced accordingly."  The remaining demand letter stated that if payment was not received, Tamra's "partnership interests in T.F.S. II, L.L.C., offered as collateral for the loan, will be attached" and her "interests in the LLC valued at the amount of the balance due" on the loan will be transferred to the MJFRT to satisfy the debt.

[¶13]  The Acorns did not make any payments in response to the demand letters.  Five of the debts were subsequently declared uncollectible and corresponding 1099-C forms were prepared and sent to the IRS and the Acorns.  The sixth debt, which was secured by Tamra's interest in T.F.S. II, L.L.C., was satisfied by a transfer of 8.44 percent of her interest in T.F.S., II, L.L.C. to the MJFRT.

[¶14]  In September 2012, Rebecca, as trustee of the MJFRT, made an additional loan to Tamra in the amount of $26,000 at 3.65 percent interest.  Tamra repaid the loan in two

---

[3] Margie also made a personal loan in the amount of $82,658 to the Moncecchis.  This loan is discussed at ¶ 15.

[4] Tamra appeared at only a portion of the meeting via telephone.  Also in attendance were Brett Vizina, a long-time employee of various Federer businesses, and Mike Hoenig, an accountant who historically provided services to the Federer family and its businesses.

4

installments of $13,000 each, in April and July 2013. It does not appear from the record that Tamra made any interest payments on this debt. *See infra* ¶ 59.

## B. The Moncecchi loan

[¶15] In 1999, Margie made a personal loan in the amount of $82,658 to Lori and Dino, and they executed a note in favor of Margie. As with other notes corresponding to loans that Margie had made to her children and their spouses, that note was ultimately transferred to the MJFRT. Beginning in January 2012, Lori and Dino commenced making monthly payments on that note, which were accepted by Rebecca on behalf of the MJFRT. On October 22, 2013, Lori and Dino filed their complaint initiating this lawsuit. Beginning in November 2013, Rebecca returned Lori and Dino's payments to them. Rebecca then sent a demand accelerating payment on the outstanding amount of the loan. At trial, Rebecca testified that Lori and Dino had not defaulted on any agreed payment schedule and admitted that she had called the note only because they had filed their complaint against the MJFRT.

## C. 2014 gifting

[¶16] It was Margie's custom to make annual gifts of MJFRT assets to her children and grandchildren. Rebecca continued to make such gifts when she succeeded her mother as trustee. In March 2014, Rebecca made gifts to herself, Tamra, and other family members including her own children, Tamra's children, and the Moncecchi children. However, Rebecca did not make any gifts to Lori or Dino at that time; rather, she waited over eight months until December 22 to make the corresponding gift to Lori. When questioned about her rationale for the delay in making the gift to Lori, Rebecca responded that she did it for "[n]o particular reason" and that she "just waited. I -- just did that. I don't know." She was asked the same question by her own counsel and admitted that it was "probably true" that her disagreements with Lori had something to do with her delaying the gift.

## D. Rebecca's payments to herself as trustee

[¶17] During the time Rebecca served as trustee of the MJFRT, she performed services for the trust including accounting and bookkeeping duties, seeing to Margie's personal care, and preparing Margie's home for sale. Beginning in 2012, Rebecca paid herself $3,000 per month from the trust for the performance of these tasks.[5] That compensation schedule continued until May 2014, approximately eight months after this lawsuit was filed. Rebecca estimated that she spent between thirty and thirty-five hours per week caring for her mother, and another five hours per week on trust business activities. The

---

[5] The evidence at trial revealed that the trust paid Rebecca $13,656 in 2011; $31,131 in 2012; $39,750 in 2013; and $15,000 in 2014.

care Rebecca provided to her mother consisted of visiting her at Aspen Wind and making sure she had clothing and other items she needed. Lori also spent significant amounts of time caring for their mother and also provided items that she needed, without compensation. Rebecca testified that although her number one priority was her mother, she had time to keep a regular employment schedule, though a "40-hour-a-week job would be really difficult."

[¶18] The Moncecchis' accounting expert, Tammy Sorenson, testified that the value of the bookkeeping services provided by Rebecca for the trust was in the range of $1,560 to $2,160 per year. There was no evidence introduced by any party as to the value of Rebecca's services in preparing the house for sale or her performance of other trust management functions, such as looking after oil and gas interests owned by the MJFRT.

## III. *Procedural history and the district court's findings*

[¶19] The Moncecchis originated this lawsuit, claiming that Rebecca, as trustee of the MJFRT, had breached her fiduciary duties to the MJFRT and its beneficiaries. They sought the removal of Rebecca as a trustee, the payment of damages incurred by the trust as a result of her conduct, and a declaratory judgment determining whether Rebecca and Tamra, as members of FHC, had the legal authority to appoint themselves as additional managers of FHC. Rebecca, in her capacity as trustee of the MJFRT, answered the complaint and counterclaimed for payment of the note that the Moncecchis had executed in favor of the MJFRT. Rebecca and Tamra, as members of FHC, also counterclaimed, alleging that Dino breached his duties as manager of FHC by hiring Spartan to manage the apartment complexes. Rebecca and Tamra sought to remove Dino as manager of FHC and also sought damages for excessive management fees they claimed Spartan charged.

[¶20] Rebecca and Tamra sought judgment as a matter of law on whether the FHC operating agreement allowed for additional managers. The district court ruled that it did, approving the addition of both Rebecca and Tamra as managers. That portion of the district court's ruling has not been appealed. Thus, currently FHC has three managers: Dino, Rebecca, and Tamra.

[¶21] A four-day bench trial was held to resolve the remaining issues. After hearing the evidence and arguments, the district court found: Rebecca breached her fiduciary duty to the MJFRT in multiple ways; Rebecca's breach of fiduciary duties warranted her removal as trustee of the MJFRT; the Moncecchis had the burden of proving damages to the MJFRT and they did not meet that burden; the Moncecchis were not in default on their loan from the MJFRT and the counterclaim seeking payment of that note was frivolous; and Dino did not violate his duty of loyalty to FHC by hiring Spartan to manage the apartment complexes, by allowing Spartan to continue its receipt of HUD incentive fees, or by allowing Spartan to continue operating laundry facilities in the apartment

6

complexes. The district court did not rule on the Moncecchis' claim against Rebecca and MJFRT for an accounting.

[¶22] On appeal, the Moncecchis argue that they did not have the burden of proof of damages to the MJFRT; rather, Rebecca had the burden of proving that disbursements to her were proper, and that they are entitled to attorney fees. In their appeal, Rebecca, as trustee of the MJFRT, and the MJFRT argue that Rebecca should not have been removed as trustee, that the district court properly applied the burden of proving damages on the Moncecchis, and that the Moncecchis are not entitled to attorney fees. Finally, Rebecca and Tamra, as members of FHC, and FHC contend that the district court's conclusion that Dino did not breach his duties to FHC was clearly erroneous.

## STANDARD OF REVIEW

[¶23] Following a bench trial, this Court reviews a district court's factual findings for clear error and reviews conclusions of law de novo. *Wallop Canyon Ranch, LLC v. Goodwyn*, 2015 WY 81, ¶ 21, 351 P.3d 943, 949-50 (Wyo. 2015).

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
>
> *Piroschak* [*v. Whelan*, 2005 WY 26], ¶ 7, 106 P.3d [887,] 890 [(Wyo. 2005)]. Findings may not be set aside because we would have reached a different result. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo. 2004). Further,
>
> > we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.
>
> *Id.* (quotation marks omitted) (some citations omitted).

7

*Id*. at ¶ 21, 351 P.3d at 950 (some citations omitted). To the extent the issues require us to use a different or additional standard of review, we clarify that in our discussion of that portion of the district court's ruling.

## *DISCUSSION*

### I. Does this Court have jurisdiction to entertain the parties' appeals, or must we dismiss because the Judgment is not a final appealable order?

[¶24] Before we proceed with the issues presented by the parties on appeal, we must be satisfied that this Court has jurisdiction to entertain the appeals. *Lokey v. Irwin*, 2016 WY 50, ¶ 5, 374 P.3d 311, 313 (Wyo. 2016); *Plymale v. Donnelly*, 2006 WY 3, ¶ 4, 125 P.3d 1022, 1023 (Wyo. 2006); W.R.A.P. 1.04(c).

[¶25] The order from which the parties appeal is the February 12, 2016 Judgment, which incorporated the district court's Findings of Fact and Conclusions of Law, entered judgment in favor of Lori and Dino on the claims asserted against them, and removed Rebecca as trustee of the MJFRT, stating "in subsequent proceedings a new Trustee will be selected in accordance with the Findings of Fact and Conclusions of Law." We therefore consider whether the Judgment is an appealable final order, despite the fact that it does not address the Moncecchis' claim against Rebecca and the MJFRT for an accounting and contemplates additional proceedings to select a new trustee.

[¶26] The Wyoming Rules of Appellate Procedure require that the notice of appeal "[i]dentify the judgment or appealable order" from which the appeal is taken. W.R.A.P. 2.07(a)(2). The rules define an appealable order as an "order affecting a substantial right in an action, when such an order, in effect, determines the action and prevents a judgment[.]" W.R.A.P. 1.05(a). Whether an order is appealable is a question of law, which we decide de novo. *Waldron v. Waldron*, 2015 WY 64, ¶ 14, 349 P.3d 974, 977 (Wyo. 2015).

[¶27] "We have held that an appealable order under Rule 1.05(a) has three necessary characteristics. . . . It must affect a substantial right, determine the merits of the controversy, and resolve all outstanding issues." *Lokey*, 2016 WY 50, ¶ 6, 374 P.3d at 314 (internal quotation marks and citations omitted); *see also Public Serv. Comm'n v. Lower Valley Power & Light, Inc.*, 608 P.2d 660, 661 (Wyo. 1980) (An appealable order is one that "determines the merits of the controversy and leaves nothing for future consideration" and "it is not appealable unless it does those things."); *Bond. v. Bond*, 30 A.3d 816, 819-20 (Me. 2011); *Knoedler v. Blinco*, 50 So.3d 1047, 1049-50 (Ala. 2010).

[¶28] "Whether a judgment . . . is final so as to be appealable is determined on the basis of practical rather than technical considerations." 4 C.J.S. *Appeal and Error* § 141 (2007,

8

database updated December 2016). Commentators have recognized that "[f]inality may be achieved if the parties tacitly abandon the issues that seem to remain open." 15B Charles A. Wright et al., *Federal Practice & Procedure Jurisdiction* § 3915.2 (2d ed. database updated April 2016). In *Skretvedt v. E.I. DuPont de Nemours*, the lower court's opinion did not explicitly dispose of the plaintiff's claim for total and permanent disability income benefits and thus the claim remained pending. 372 F.3d 193, 201 (3d Cir. 2004). The appellate court determined that the pending claim was rendered moot because the plaintiff had not argued that those benefits had not been paid or that they had been miscalculated. *Id*. Therefore, there were no unresolved issues and the lower court's opinion was appealable. *Id*. The court recognized that

> to determine the effect of a district court's decision—and therefore to determine whether there is a final order—it is sometimes necessary to look beyond the pleadings. A final order is not absent just because the district court failed to adjudicate all of the claims that were at one time pleaded. Instead, an appellate court must determine whether, at the time it is examining its jurisdiction, there remain unresolved issues to be adjudicated by the district court.

*Id*. (quoting *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 557 (3d Cir. 1997)).

[¶29] Here, while the district court's Judgment did not explicitly determine the claim for an accounting, it has been resolved as a practical matter. The Moncecchis did not provide any evidence or argument at trial concerning that claim; they did not request an accounting in their proposed findings of fact and conclusions of law; and they did not claim error on appeal regarding the accounting. We can infer from the evidence contained in the record that through discovery the Moncecchis obtained all the information that was available regarding the accounts of the MJFRT and Rebecca's administration of the trust. Moreover, if an accounting were to be awarded at this late date, it would not impact the rights of the parties or the issues before this Court. Accordingly, we conclude that the unresolved claim for an accounting does not affect the finality of the Judgment.[6]

[¶30] We now turn to the question of whether the task of appointing a new trustee, which was reserved by the district court, affects the finality of the Judgment. Ordinarily a judgment will be considered final and appealable although further ministerial or

---

[6] We note that the issue of any outstanding claims could easily have been resolved by the district court in a final pre-trial order. *See Pennaco Energy, Inc. v. Sorenson*, 2016 WY 34, ¶ 26 n.12, 371 P.3d 120, 126 n.12 (Wyo. 2016).

9

administrative actions by the trial court are necessary to implement it. 15B Wright, *supra*, § 3915.2; 4 C.J.S., *supra*, § 147. "Many reservations or conditions [in a judgment] are compatible with finality," however "there is no convenient formula" to determine when the requirement for further proceedings defeats finality. 15B Wright, *supra*, § 3915.3. Judgments that "expressly retain[] jurisdiction to enter merely ministerial orders" can be final. *Id*. Likewise, judgments that completely resolve the claims and grant the relief sought have been held to be final even where further work remains to be done. 15B Wright, *supra*, § 3915.2 n.34.

[¶31] In *Tyler v. City of Manhattan*, 118 F.3d 1400, 1402 (10th Cir. 1997), the City argued that the lower court's judgment was not appealable because it retained jurisdiction over the parties until they complied with the terms of the injunction it had ordered. The Tenth Circuit rejected that argument and held that "[t]he fact that the district court may retain jurisdiction over the parties to enforce its judgment does not convert the judgment to an interlocutory order for purposes of appeal." *Id*. at 1402 n.1 (citations omitted). The court went on to explain that "[a]n order or judgment is final for purposes of appeal if it resolves all substantive issues on the merits and effectively ends the litigation." *Id*. (citing *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633-34, 89 L.Ed. 911 (1945); *Turnbull v. Wilcken*, 893 F.2d 256, 257 (10th Cir. 1990)).

[¶32] In this instance, the selection of a new trustee was warranted because the district court resolved the pending claim for removal of Rebecca as the trustee of the MJFRT. In its Findings of Fact and Conclusions of Law, which were incorporated into the Judgment, the district court ordered:

> The parties have thirty (30) days to agree upon a neutral trustee for the [MJFRT] and submit that proposal to the court with the proposed final judgment. If there is no agreement, the parties shall submit their proposals for a neutral trustee to the court, and the court will name a successor trustee in the final judgment.

While the Judgment does not name a successor trustee, it provides "in subsequent proceedings a new Trustee will be selected in accordance with the Findings of Fact and Conclusions of Law." From the record before this Court, we cannot determine whether a new trustee has been named. However, we conclude that the determination of a new trustee is a ministerial function and that because the claims of the parties have fully been resolved, that function does not defeat the finality of the Judgment. The Judgment is an appealable order, and we therefore have jurisdiction to consider the merits of the parties' appeals.

***II.*** ***Was the district court's conclusion that Dino Moncecchi did not breach his fiduciary duties to Federer Holding Company, LLC, by not soliciting bids from competitive property management companies or by appropriating business opportunities for Spartan, clearly erroneous?***

[¶33]  The majority of the arguments raised by FHC[7] concern its contentions that Dino should have solicited competitive bids for the management of the apartment complexes, and that Spartan should not have retained HUD incentive payments or operated the laundry facilities in the apartment complexes for its sole benefit.  FHC argues that the district court erred in concluding: (1) Dino had not breached his statutory and contractual obligations by not investigating industry standards or otherwise soliciting competitive bids from other management companies; (2) Dino had not breached his statutory obligations by engaging in self-dealing when he used Spartan to manage the apartment complexes; (3) Dino had not breached his statutory obligations when he availed himself of business opportunities that should have been afforded to FHC; and (4) Dino's self-dealing was fair to the holding company because there is common ownership between FHC and Spartan.

[¶34]  While we have recognized that limited liability companies are "intended to be much more flexible than a corporation[,]" *GreenHunter Energy, Inc. v. Western Ecosystems Tech., Inc.*, 2014 WY 144, ¶ 20, 337 P.3d 454, 461 (Wyo. 2014); *Kaycee Land & Livestock v. Flahive*, 2002 WY 73, ¶ 12, 46 P.3d 323, 328 (Wyo. 2002); *see also* Dale W. Cottam, et al., *The 2010 Wyoming Limited Liability Company Act: A Uniform Recipe with Wyoming "Home Cooking,"* 11 Wyo. L. Rev. 49, 64 (2011) ("the Original LLC Act intended for LLCs to be more flexible"), management of an LLC is not free of formalities and duties.  *See* Wyo. Stat. Ann. §§ 17-29-101 through 17-29-1105 (LexisNexis 2015).[8]  Those duties include fiduciary duties owed to the LLC by its managers.  Wyo. Stat. Ann. § 17-29-409(a) and (g).

---

[7] In appeal No. S-16-0099, the Appellants are Tamra Acorn and Rebecca Shwen in their capacity as managers/officers of the Federer Holding Company, LLC and the Federer Holding Company, LLC.  We will refer to these parties collectively as FHC.

[8] FHC was formed in 2006.  The 2010 Wyoming Limited Liability Company Act was effective on July 1, 2010.  2010 Wyo. Session Laws, ch. 94, § 5.  This lawsuit was filed in 2013 and FHC's counterclaims were brought in 2014.  Wyo. Stat. Ann. § 8-1-107 (LexisNexis 2015) provides:

> If a statute is repealed or amended, the repeal or amendment does not affect pending actions, prosecutions or proceedings, civil or criminal. . . . nor shall any repeal or amendment affect causes of action, prosecutions or proceedings existing at the time of the amendment or repeal, unless otherwise expressly provided in the amending or repealing act.

We recognize that some of Dino's conduct occurred prior to 2010 and continued through the date of this lawsuit and counterclaims. Thus, a cause of action might arguably have existed prior to the effective date

11

[¶35] The fiduciary duties owed to an LLC by its manager require the manager to act carefully and disinterestedly. Larry E. Ribstein & Robert R. Keatinge, 1 *Ribstein and Keatinge on Limited Liability Companies* § 9:1 at 539 (2d ed. 2016). Wyoming's Limited Liability Company Act, Wyo. Stat. Ann. §§ 17-29-101 through 17-29-1105, describes those duties:

> (b) The duty of loyalty of a [manager] in a [manager]-managed limited liability company includes the duties:
>
> (i) To account to the company and to hold as trustee for it any property, profit or benefit derived by the member:
>
>> (A) In the conduct . . . of the company's activities;
>>
>> (B) From a use by the [manager] of the company's property; or
>>
>> (C) From the appropriation of a limited liability company opportunity;
>
> (ii) To refrain from dealing with the company in the conduct . . . of the company's activities as or on behalf of a person having an interest adverse to the company; and
>
> (iii) To refrain from competing with the company in the conduct of the company's activities before the dissolution of the company.

Wyo. Stat. Ann. § 17-29-409(b).[9] The statute goes on to provide:

> (c) Subject to the business judgment rule, the duty of care of a [manager] of a [manager]-managed limited liability company in the conduct . . . of the company's activities is to act with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner the [manager] reasonably believes to be in the best interests or at least not opposed to the best interests of the company. In discharging this duty, a member may rely in good faith upon opinions, reports, statements or other information provided by another person that the member

---

of the 2010 Limited Liability Company Act. FHC asserted violations of the 2010 Act in its counterclaims. As a result, the district court applied the 2010 Act in its analysis and so do we.
[9] Wyo. Stat. Ann. § 17-29-409(g) makes these provisions applicable to manager-managed limited liability companies.

12

reasonably believes is a competent and reliable source for the information.

(d) A . . . [manager of] a [manager]-managed limited liability company shall discharge the duties under this chapter or under the operating agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing.

Wyo. Stat. Ann. § 17-29-409(c) and (d). Thus, a manager of a limited liability company has statutorily-imposed duties of loyalty, care, and good faith and fair dealing. Those duties require the manager to conduct business in a manner that the manager reasonably believes to be in the best interests or not opposed to the best interests of the company, to refrain from competing with the limited liability company, and to act in good faith. *Id.*

## A. Dino's failure to obtain competitive bids

[¶36] We turn to FHC's contention that Dino's failure to solicit competitive bids from other management companies breached his duties toward FHC. FHC contends that this failure was a breach of the covenant of good faith and fair dealing and the statutory duty to act reasonably and "in the best interests or at least not opposed to the best interests of the company." Wyo. Stat. Ann. § 17-29-409(c). While FHC emphasizes the fact that Dino did not seek alternative bids, it presents no authority in support of the notion that a manager of an LLC has a duty to obtain competitive bids before entering into an agreement.

[¶37] The district court concluded that Dino did not breach his duty of good faith and fair dealing or other duties to FHC when he did not seek a different management company to manage the apartment complexes. The court found:

> Dino Moncecchi testified, very credibly to the court, that Spartan provides "full asset management" services for the nine apartments, which includes a comprehensive needs assessment on the properties. He also testified that he performs other duties that go beyond your "run-or-the-mill management services," such as negotiating insurance claims and lobbying governmental entities on issues that impact the property owner. [FHC] did not challenge Dino on cross-examination as to these matters, and they appeared to concede that he performs these additional management duties.

The district court also found FHC's expert to be unreliable, highlighting the fact that he did not compare the enhanced duties described by Dino to the fees charged by other management companies, and that he had not even seen the competitive bids for

13

management services later obtained by Tamra and Rebecca. Finally, the district court noted that the bids solicited by Tamra and Rebecca exceeded the range that the FHC expert had testified would be reasonable.

[¶38] The district court's finding that Dino's failure to seek competitive bids and secure the services of a management company other than Spartan does not breach his duties as an LLC manager was not clearly erroneous, especially where Spartan's services and its accompanying fees had been continuous and unchanged over a period of decades, and where FHC did not establish that Spartan's fees were unreasonable.

## B. Self-dealing in hiring Spartan as management company

[¶39] However, the fact that the manager of an LLC enters into a contract with another entity owned, even partially, by the manager raises the question of whether that action was disinterested. *See* Wyo. Stat. Ann. § 17-29-409(b); *Wallop Canyon Ranch*, 2015 WY 81, ¶ 52, 351 P.3d at 958 (stating in partnership context that "self-dealing can form the basis for a finding of conflict of interest by a partner, even when the deals are with a separate entity, when that entity has substantial connections with the partner"). Thus, we turn to the question of whether Dino, as manager of FHC, engaged in prohibited self-dealing when he continued to engage Spartan, which is owned in part by Dino and Lori.

[¶40] While our statutes governing limited liability companies do not specifically define conflicts of interest or self-dealing, they do prohibit a manager from dealing as a person "having an interest adverse to the company." Wyo. Stat. Ann. § 17-29-409(b)(ii). "It is a defense to a claim under [this provision] that the transaction was fair to or at least not opposed to the limited liability company." Wyo. Stat. Ann. § 17-29-409(e). Thus, once a party proves that a manager has an interest adverse to the limited liability company, the manager has the burden of establishing that the transaction was fair or not opposed to the company. *See* 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 1036, at 49 (perm. ed. rev. vol. 2011 and Cum. Supp. 2016-2017)); *Synetic Ventures I, LLC v. EVI Corp.*, 294 P.3d 478, 485 (Or. 2012); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 407 F.Supp.2d 483, 501 (S.D.N.Y. 2005); *Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995) (applying the same standard in the limited partnership context); *Lynch v. Patterson*, 701 P.2d 1126, 1133 (Wyo. 1985) (applying the same standard in the corporate context).

[¶41] The district court recognized the existence of a "potential conflict" between Dino's position as the manager of FHC and his ownership interest in Spartan. This shifted the burden to Dino to prove that his continued use of Spartan to manage the apartment complexes was fair to FHC. The district court found that it was, and as a result, concluded that the fairness defense available under Wyo. Stat. Ann. § 17-29-

14

409(e) applied and there was no violation of the statutory provision prohibiting dealing with persons who have an adverse interest.

[¶42]   The district court reasoned that Dino's continued use of Spartan was fair to FHC in part because there is common ownership between FHC and Spartan.  Thus, if Spartan's management of the apartment complexes benefitted Dino, it also benefitted the other owners of FHC, namely Rebecca and Tamra, because of their interests in Spartan.[10]  FHC takes issue with this rationale, arguing, without citation to authority, that such reasoning is contrary to law.

[¶43]   The fairness doctrine contained in the Wyoming Limited Liability Company Act provides that "[i]t is a defense to a claim under paragraph (b)(ii)[11] of this section and any comparable claim in equity or at common law that the transaction was fair to or at least not opposed to the limited liability company."  Wyo. Stat. Ann. § 17-29-409(e).  Thus, the Act does not prevent managers from transacting business with the LLC, but it does require that the terms of the transaction are fair "***to the limited liability company***."  *Id*. (emphasis added).  *See also Wallop Canyon Ranch*, 2015 WY 81, ¶ 54, 351 P.3d at 958 (Individuals or entities are commonly principals in related businesses; this does not in and of itself create a conflict of interest when those related entities engage in business with each other.").

[¶44]   To the extent the district court determined that the use of Spartan was fair to FHC because it was fair to Rebecca and Tamra due to their status as beneficiaries of an owner of Spartan, that rationale was misplaced.  The proper test is whether the transaction was fair to FHC.  *See* 2 Zolman Cavitch, *Business Organizations* § 33.05[3] at 33-31 (Matthew Bender/LexisNexis 2003).  As summarized above, Dino testified regarding the services that Spartan performed, the origination of the fees charged to FHC, and the reasonableness of those fees.  *See supra* ¶ 8.  That evidence supports the district court's conclusion that the use of Spartan to manage the apartment complexes was fair.

[¶45]   Further, Wyoming's Limited Liability Company Act provides that the operating agreement governs "[t]he rights and duties under this chapter of a person in the capacity of manager," Wyo. Stat. Ann. § 17-29-110(a)(ii), and provides that "[t]o the extent the operating agreement does not otherwise provide for a matter . . . this chapter governs the matter."  Wyo. Stat. Ann. § 17-29-110(b).  Thus, where the operating agreement contains specific provisions regarding a manager's rights and duties, it prevails.  However, the Act also prohibits the operating agreement from eliminating the contractual obligation of good faith and fair dealing under Wyo. Stat. Ann. § 17-29-409(d).

---

[10] Rebecca and Tamra are beneficiaries of the Marital Trust, which owns a 35 percent interest in Spartan.

[11]  Wyo. Stat. Ann. § 17-29-409(b)(ii) provides that the duty of loyalty includes the duty to "refrain from dealing with the company in the conduct . . . of the company's activities as or on behalf of a person having an interest adverse to the company[.]"

15

[¶46] The FHC Operating Agreement permits Dino, as the manager of FHC, to contract with entities owned by or affiliated with himself, such as Spartan. It states: "Agents, servants, employees, accountants, attorneys, investment advisors, independent contractors, ***and management companies*** hired under this Section may be Members of the Company or shareholders, members or employees of Company Members, or ***entities owned by or directly or indirectly affiliated with Members or the Manager***." (Emphasis added.) The operating agreement also contains the following provision: "<u>No Exclusive Duty to Company.</u> Manager and Officers are not required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities without violating their fiduciary duties under the Act and this Agreement." These terms of the operating agreement grant permission to Dino, as the manager of FHC, to use Spartan, which is owned in part by Dino, to manage the FHC apartment complexes. This is corroborated by the fact that the attorney who drafted the FHC limited liability documents anticipated that management of the properties after FHC was formed would not change when he stated that "Dino was appointed manager [of FHC] since he had been managing the HUD partnerships for the family and to provide continuity for HUD."

[¶47] Because the operating agreement allows Dino to contract with entities he owns for the management of FHC, Dino's use of Spartan to manage the apartment complexes does not constitute improper self-dealing or a breach of his fiduciary duties. Further, FHC failed to establish that use of Spartan violated Dino's duty of loyalty and good faith and fair dealing. The district court's conclusion that Dino's continued use of Spartan to manage the apartment complexes did not violate Dino's duties was not clearly erroneous.

## C. Self-dealing in business opportunities

[¶48] FHC next argues that the district court erred when it concluded that Dino Moncecchi had not breached his fiduciary duty when he availed himself of business opportunities that allegedly should have been afforded to FHC. FHC claims that Dino appropriated business opportunities belonging to FHC in two respects: first, by having Spartan retain HUD incentive fees, and second, in Spartan's operation of laundry facilities in the apartment complexes.

[¶49] The duty of loyalty includes a duty to "account to the company and to hold as trustee for it any property, profit or benefit derived by the [manager] . . . [f]rom the appropriation of a limited liability company opportunity[.]" Wyo. Stat. Ann. § 17-29-409(b)(i)(C). Other courts have held that this duty "includes the duty not to engage in enterprises directly in competition with and necessarily having an injurious or detrimental effect on the corporation's business." *Astarte, Inc. v. Pacific Indus. Sys., Inc.*, 865 F.Supp. 693, 707 (D. Colo. 1994) (citing *T.A. Pelsue Co. v. Grand Enterprises, Inc.*, 782 F.Supp. 1476, 1485 (D. Colo. 1991); *Williams v. Stirling*, 583 P.2d 290, 292 (1978)).

16

The *Astarte* court explained that a party claiming breach of fiduciary duty through the appropriation of a business opportunity must

> establish that it had an actual or expected interest in an asset or property, and that it had the financial ability to acquire the asset or property. *See Collie* [*v. Becknell*], 762 P.2d [727,] 730 [(Colo. App. 1988)]. Even though a corporation might have had some rights with regard to the acquisition of property, in order for that opportunity to be usurped, ***the acquisition must have been within the corporation's expectation.*** *Three G Corp. v. Daddis*, 714 P.2d 1333, 1336 (Colo. App. 1986). Similarly, to establish an expectancy, it is not sufficient for plaintiff to show only that a proposed opportunity possesses value to it, but plaintiff must also show that there is a practical, not a mere theoretical, basis for the opportunity. *See Colorado and Utah Coal Co. v. Harris*, 97 Colo. 309, 313, 49 P.2d 429[, 431] (1935).

*Astarte*, 865 F.Supp. at 707 (emphasis added).

[¶50] We first examine the HUD incentive fees. FHC relies solely on the following exchange to support its contention that Dino breached his duty of loyalty with respect to those fees:

> Q. [Attorney for FHC:] Now, the HUD agreements concerning the five HUD properties that [Spartan] is managing require that the property owners get to decide how the incentive performance fees are distributed, correct?
>
> A. [Dino:] Yes.
>
> Q. Throughout the entire time you were the sole manager of [FHC] and the sole manager of [Spartan], were incentive fees paid upon properties controlled by [FHC]?
>
> A. Yes.
>
> . . . .
>
> Q. Who retained those incentive performance fees?
>
> A. [Spartan] was paid the incentive performance fee according to the agreement.

17

> Q. And is this the agreement that was entered into way back in 2004?
>
> A. Well, yes, during the initial refinancing.
>
> Q. And prior to the creation of [FHC]?
>
> A. Yes.

Dino also testified that under his management of FHC, he continued operating under the terms of the prior management contracts. The evidence is uncontroverted that the payment of the HUD fees to Spartan was pursuant to Spartan's agreements with the owners of the apartments, and FHC had no expectation of receiving the fees. Because FHC had no expectation of receiving those fees, Dino did not "appropriate" the HUD incentive fees and thus did not contravene his fiduciary duty to FHC. *See Astarte*, 865 F.Supp. at 707.

[¶51]  We now turn to the question of whether Spartan's management of the laundry facilities in the apartment complexes breached the duty of loyalty as an appropriation of FHC's opportunity. The evidence introduced at trial demonstrates that the laundry facilities also did not represent a corporate opportunity for FHC. The laundry facilities were installed when the properties were built, and they have been operated by Spartan pursuant to an agreement with the owners since that time, which was even prior to the time Dino began working for Spartan. Based upon these uncontroverted facts, there was no expectation that FHC would operate the laundry facilities in the apartment complexes. Therefore, Dino did not breach his duty of loyalty to FHC by continuing to have Spartan manage those facilities and receive the profits from doing so. The district court's finding that Dino did not violate his statutory and contractual fiduciary duties to FHC is supported by the record and is not clearly erroneous. We therefore affirm.

[¶52]  FHC also argues that we should reverse the district court's finding that it did not prove damages. Because we have affirmed the district court's conclusion that Dino did not breach his fiduciary duties to FHC, we do not reach the question of damages.

### III.  *Was the removal of Rebecca Shwen as trustee of the Margie Jean Federer Revocable Trust based on findings that were clearly erroneous?*

[¶53]  The district court held that Rebecca breached her fiduciary duty as the trustee of the MJFRT when she engaged in the following conduct: making a loan to Tamra after other Acorn debts had been declared uncollectible, calling the Moncecchi loan, overpaying herself for duties performed as a trustee, and delaying the MJFRT 2014 gift to Lori. The district court then concluded that the cumulative nature of these violations

18

warranted Rebecca's removal as trustee. Rebecca does not dispute that calling the Moncecchi loan was a breach of her fiduciary duty, but she argues that making the loan to Tamra, paying herself, and delaying Lori's 2014 gift did not violate her fiduciary duty. Thus, she contends, any breach on her part is not sufficient to warrant her removal as trustee.

## A.    Breach of fiduciary duties

[¶54]  In determining a trustee's standard of care, we look to both the trust provisions and the statutes governing trusts in Wyoming. *Forbes v. Forbes*, 2015 WY 13, ¶¶ 23-27, 341 P.3d 1041, 1051-52 (Wyo. 2015). The "common duty owed by a trustee goes beyond mere 'good faith' unless otherwise provided by express terms of the trust." *Wells Fargo Bank Wyo., N.A. v. Hodder,* 2006 WY 128, ¶ 33 n.7, 144 P.3d 401, 413  n.7 (Wyo. 2006). The MJFRT provides that a trustee "will be indemnified and held harmless from the good faith exercise of all powers, duties, and elections of Trustee." This language is similar to the language of the trust provision we considered in *Forbes*,[12] where we held that the express terms of the trust provided that the trustee's duties did not go beyond good faith. 2015 WY 13, ¶ 25, 341 P.3d at 1051.

> We have defined "good faith" as "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Hodder*, 2006 WY 128, ¶ 33, 144 P.3d at 413 (quoting *Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 18, 18 P.3d 645, 653 (Wyo.2001)).

*Id*. at ¶ 26, 341 P.3d at 1051.  We have also held that this good faith standard does not exclude the application of other fiduciary obligations imposed by Wyoming statutes. *Id*. at ¶ 27, 341 P.3d at 1051-52; *Kerper v. Kerper*, 780 P.2d 923, 930 (Wyo. 1989). Thus, Rebecca was required to conduct herself in compliance with the duty of good faith and the statutory provisions regarding a trustee's duty of loyalty.

[¶55]  The Wyoming Uniform Trust Code provides that "[a] trustee shall invest and manage the trust assets solely in the interest of the beneficiaries," Wyo. Stat. Ann. § 4-10-905 (LexisNexis 2015), and that "[i]f a trust has two (2) or more beneficiaries, the trustee shall act impartially in investing and managing the trust assets, taking into account any differing interests of the beneficiaries."  Wyo. Stat. Ann. § 4-10-906 (LexisNexis 2015).

---

[12] In *Forbes*, the trust agreement provided that "[n]o trustee hereunder shall be held personally liable for any act or omission whatever which he performs, commits, or suffers in good faith." *Id*. at ¶ 23, 341 P.3d at 1051.

## B. Loans to Tamra and Moncecchis

[¶56]  We first examine whether Rebecca complied with these requirements when she made the loan to Tamra.  In September 2012, the MJFRT made a $26,000 loan to Tamra at 3.65 percent interest.  The district court held that Rebecca breached her fiduciary duty by making that loan when Tamra had previously defaulted on all of the trust's prior loans. The court found:

> Rebecca's decision to make this loan to Tamra—with her poor track record of repayment of trust loans—stands in stark contrast to her decision to call Lori and Dino's loan when the Moncecchis were making regular monthly payments.  It again demonstrates a lack of impartiality in the manner in which Rebecca is administering this trust.

In a footnote, the district court commented that though "Tamra did eventually repay the principal of this loan (without interest), it does not take away from Rebecca's imprudent decision to make the loan in the first place."

[¶57]  Rebecca argues that the district court's conclusion that the loan to Tamra was a breach of her duties was erroneous for three reasons.  First, she argues that the district court inconsistently concluded that her handling of the Acorn debt was proper because she had relied upon advice of counsel, yet the loan to Tamra was also based upon advice from the same attorney and the court found it to be a violation of Rebecca's duties. Second, the court erred in finding that interest was not paid on the loan.  Third, the loans that were declared uncollectible will still be deducted from Tamra's share of the MJFRT distributions upon Margie's death.  Rebecca contends that based upon the evidence as a whole, it was not wrong for her to make the loan to Tamra and the district court demonstrated a "level of confusion" regarding the evidence when it concluded otherwise. We disagree.  Assuming the evidence of the Moncecchis is true and giving them every reasonable inference that fairly can be drawn from that evidence, as we are required to do, we conclude that the district court's finding that Rebecca breached her duties to the MJFRT in making the loan to Tamra was supported by the record and was not clearly erroneous.

[¶58]  The transactions conducted by Rebecca that were countenanced by the district court because she had sought the advice of counsel were complicated transactions with layers of tax and other implications.  In addition, the record is replete with evidence regarding preparation for those transactions that included memoranda, meetings and exchanges between Rebecca, beneficiaries of the MJFRT, attorneys, and accountants.  In contrast, the only evidence in the record respecting any consultation with an attorney about the loan at issue is a statement by Rebecca that she consulted with Mr. Leonard

(the attorney for the Trust) about the loan and that he did not respond in writing. There is no evidence whether the loan was encouraged or discouraged by Mr. Leonard, whether the consultation included the potential ramifications of making such a loan, or whether the discussion was more extensive than a request to draft loan documents.

[¶59] Whether Tamra paid interest on the loan is irrelevant to the issue of whether it was a breach of Rebecca's duty to make the loan in the first place. Moreover, while Rebecca claims that interest had been paid on the loan, the district court found otherwise. We defer to findings of the trial court when it is acting as a fact finder unless those findings are unsupported by the record or erroneous as a matter of law. *Wallop*, 2015 WY 81, ¶ 21, 351 P.3d at 949-50. This finding is supported by the record. The note calls for twelve monthly payments beginning on February 1, 2013, with 3.65 percent interest; Tamra made no monthly payments; by the time the first payment of $13,000 was made in April 2013, $587.60 in interest had accrued; and by the time the next payment of $13,000 was made in July 2013, $666.90 in interest had accrued. The check alleged to have been an interest payment by Tamra is dated more than a year later, is in the amount of $172.13, and contains no reference to the loan.

[¶60] Finally, it is true that the principal (but not the interest) of the other Acorn loans that were declared uncollectible will still be deducted from Tamra's share of the MJFRT distributions upon Margie's death. *See supra* ¶ 11 n.2. However, that fact does not make another loan to Tamra a prudent decision. The district court recognized the imprudence of making a loan to a borrower with a "poor track record." In addition, when a loan was made from the MJFRT, the note became an asset of the MJFRT and estate taxes are paid based upon the value of the trust assets. Therefore, if Tamra failed to repay the loan and the loan was not declared uncollectible, on Margie's death the MJFRT would owe taxes for the outstanding amount due on the note, even if that amount is deducted from Tamra's share of the MJFRT distributions. In short, making another loan, especially to a borrower who had proven her inability or unwillingness to pay principal and interest payments in the past, carried inherent risk to the trust. As the district court found, Rebecca's loans to Tamra are especially indicative of her lack of impartiality when viewed in contrast to her decision to call the loan to Lori and Dino, a loan upon which they had been making timely payments. See *infra* ¶ 86. The district court's conclusion that Rebecca's decision to make this loan to Tamra was a breach of statutory duties requiring her to act impartially and in the interest of the trust beneficiaries was not clearly erroneous.

## C. Rebecca's payments to herself

[¶61] We now turn to the question of whether Rebecca's payments to herself were a breach of her fiduciary duties to the MJFRT. The district court held that Rebecca "violated her fiduciary duties to the trust by overpaying herself for her services to the trust, and also using trust money improperly for herself." Rebecca argues that the district court's "negative opinion" toward her "clouded" its view of the facts regarding her

compensation and that, although it is admittedly not a part of the record, an institutional trustee would charge much more than she did for the administration of the trust.[13] Rebecca also emphasizes testimony given by the Moncecchis' expert admitting that she does not know how much time was spent on activities other than bookkeeping to bolster her argument that her fees were reasonable. We find that the record supports the district court's conclusion.

[¶62] The MJFRT permits a trustee to pay herself a "reasonable trustee fee" for services rendered to the trust. The trust does not provide for compensation for the personal care of any of its beneficiaries. At trial, Rebecca testified regarding the time she spent on various activities:

> Q. [Attorney for trust:] Okay. How much time would you spend per week with the personal care that you discussed with your mom?
>
> . . . .
>
> A. [Rebecca Shwen:] Okay. I would say I spend -- kind of hard to say -- 30, 35 hours a week.
>
> . . . .
>
> Q. How much time would you spend on behalf of your mother's trust that would be related to her trust business activities?
>
> A. Business activities?
>
> Q. Not her personal care.
>
> A. I would say about five hours a week.

---

[13] We will not consider the fees an institutional trustee might charge to administer the MJFRT, as that evidence was never solicited or introduced at trial and is not part of the record on appeal. As we have stated on numerous occasions, we will not consider evidence that is not part of the record on appeal or arguments that were not presented to the trial court. *See, e.g.*, *Beeman v. Beeman*, 2005 WY 45, ¶ 10, 109 P.3d 548, 551 (Wyo. 2005); *Barnes v. Barnes*, 998 P.2d 942, 945 (Wyo. 2000); *Mize v. North Big Horn Hosp. Dist.*, 931 P.2d 229, 233 (Wyo. 1997).

Beginning in 2012, Rebecca paid herself $3,000 per month.[14] She testified, "So in 2012 I began taking $3,000 a month from the trust so that I could spend this extra time with [Margie], then I could provide as much as I could care for her." From 2012 through May 2014, Rebecca received a total of $85,881 in compensation from the MJFRT. The Moncecchis' accounting expert, Tammy Sorenson, testified that a reasonable annual fee for the bookkeeping services Rebecca provided to the trust ranges between $1,560 and $2,160. The trial court found this testimony to be credible and noted that it was corroborated by Mike Hoenig, the Federers' accountant, who testified that if he had to perform the work performed by Rebecca, it would cost the trust an additional $1,500 to $2,000 per year. The record also shows that Rebecca spent $1,421.59 in trust money to pay for dining at various restaurants and fast food establishments between January 2013 and June 2014.

[¶63] The district court held that Rebecca was "not charging the trust a 'reasonable fee' for her services," that her fee "vastly exceed[ed]" the range that would be considered a reasonable bookkeeping fee, and that she could not justify her fee based on the time she spent caring for her mother because the trust does not provide compensation for such services. It found that there was no justification for using trust money for restaurant expenditures. The court concluded that this conduct was a breach of Rebecca's fiduciary duties to the trust. These findings are not clearly erroneous.

### D. The delayed gift

[¶64] Finally, we examine Rebecca's contention that delaying Lori's 2014 gift did not violate her fiduciary duty. Rebecca concedes that she delayed this gift to Lori because of their "disagreement." The district court determined that this conduct showed a "lack of impartiality in the manner in which Rebecca administered the trust" and "demonstrate[d] bad faith." On appeal, without citing any authority, Rebecca argues that the Moncecchis' complaint did not allege that this conduct violated her fiduciary duties because it happened after the lawsuit was filed and they "could not have envisioned this issue" at that time, and that hostility between a trustee and a beneficiary is not, in itself, grounds for removal of a trustee.

[¶65] To the extent Rebecca's argument is that because the Moncecchis filed this lawsuit in October 2013, they could not have alleged that the delay in gifting violated her fiduciary duties because it had not yet occurred, we note that the Moncecchis filed their First Amended Complaint on February 20, 2015, which was after the conduct at issue occurred. If Rebecca's contention is that Lori did not plead her conduct in delaying the

---

[14] This payment schedule continued through May 2014, approximately eight months after the Moncecchis' complaint was filed alleging that Rebecca was paying herself an excessive fee to manage the MJFRT.

loan was a violation of her fiduciary duties, we note that the Moncecchis' First Amended Complaint contains the following allegation:

> 11. Defendant Shwen has materially breached the above-described fiduciary duties. The actions of Rebecca Shwen which violate her duty to the Revocable Trust include, but are not limited to:
>
> . . . .
>
> c. Hostility to beneficiary Lori Moncecchi and favorable and unequal treatment to beneficiary, Tammy Acorn. There are many instances of this, including favorable treatment to Acorn on loans, interest rates, sharing of information, and debt collection efforts. Shwen regularly evinces hostility to Lori Moncecchi.

[¶66] Rule 8(a)(2) of the Wyoming Rules of Civil Procedure states that a "pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]"

> This rule is based upon the theory of notice pleading and only requires that a plaintiff "plead the operative facts involved in the litigation so as to give fair notice of the claim to the defendant." Further, "pleadings must be liberally construed in order to do justice to the parties . . . ."

*Ridgerunner, LLC v. Meisinger*, 2013 WY 31, ¶ 12, 297 P.3d 110, 114 (Wyo. 2013) (internal citations omitted). As we stated in *Forbes*, "[w]hether the specificity requirement of the rule has been satisfied rests upon whether fair notice has been provided to the opposing party." 2015 WY 13, ¶ 39, 341 P.3d at 1054.

[¶67] In *Ridgerunner* and *Forbes*, we held that the parties had not adequately given notice of their claims. In *Ridgerunner*, we considered whether the plaintiff had provided adequate notice in the complaint that it sought to pierce the corporate veil. 2013 WY 31, ¶ 16, 297 P.3d at 116. We concluded that because the complaint contained no indication of the plaintiff's desire to pierce the corporate veil, the district court's dismissal was proper. *Id*. In *Forbes*, the plaintiff had asserted three ways in which he claimed the defendant trustees had breached their duties to the trust, none of which gave notice that water rights were at issue. 2015 WY 13, ¶ 43, 341 P.3d at 1055. We held that because he had identified land transactions and not water transactions as a basis for his claim, the defendants were not put on notice of the water transactions as a basis for his breach of

loyalty claim, holding that if we concluded otherwise, "the defendants would potentially be required to prepare to litigate any of the actions they took as trustees." *Id*. at ¶ 44, 341 P.3d at 1055.

[¶68] *Lynch* addressed the question of whether the plaintiff had alleged sufficient facts in his complaint to assert his claim that the defendant directors took excessive salaries. 701 P.2d at 1134. In his complaint, the plaintiff never mentioned salaries, but he did assert that the "directors had breached their fiduciary obligations by diverting funds from the corporation to its detriment. This allegation sufficed to inform the defendants that an issue existed as to the reasonableness of the executive salaries . . . ." *Id*. The Moncecchis' allegations align more closely with those in *Lynch*. They state that Rebecca was hostile toward Lori and gave Tamra favorable treatment. Although the complaint does not specifically allege that Rebecca's hostility toward Lori was demonstrated by her delay in making the 2014 gift, there were sufficient allegations to put Rebecca on notice that the Moncecchis took issue with her conduct toward Lori, especially as contrasted with Tamra. These allegations put Rebecca on notice that an issue existed as to the fairness of her treatment of Lori as a beneficiary of the trust, including her conduct in making gifts. "Allegations of particular acts or omissions of the defendant are unnecessary where the duty owed by the defendants appears to exist and to have been breached." *Id*., 701 P.2d at 1134.

[¶69] The district court's findings that Rebecca breached her fiduciary duty as the trustee of the MJFRT when she made the loan to Tamra after she had defaulted on other debts to the trust, when she called the Moncecchi loan, when she overpaid herself, and when she delayed the 2014 gift to Lori are not clearly erroneous. Because we affirm the district court's conclusion that Rebecca breached her fiduciary duties to the MJFRT, we now turn to the question of whether the district court properly removed her as a trustee.

### E. Removal of Rebecca as trustee

[¶70] In *Forbes*, this Court set forth the standard for removal of a trustee when that trustee is a family member selected pursuant to the terms of the trust, as opposed to a court-appointed trustee:

> *Removal of a trustee, however, "usually will not be grounded on a mere error of judgment or conduct even though there is a technical breach of the trust, if the trust estate does not suffer*." *Schildberg v. Schildberg*, 461 N.W.2d 186, 191 (Iowa 1990) (citing 76 Am. Jur. 2d *Trusts* § 130, at 370 (1975)). "*Generally, the court will not remove a testamentary trustee absent a demonstrated abuse of power*." *In re Estate of Klarner*, 113 P.3d [150,] 157 [(Colo. 2005)] (citing *Copley v. Copley*, 126 Cal.App.3d 248, 178

25

Cal.Rptr. 842, 866 (1981); *Culver v. Culver*, 112 Ohio App. 100, 169 N.E.2d 486, 489 (1960) (so long as trustee executes trust in good faith and sound discretion, court has no right to interfere)).

*Id.*, 2015 WY 13, ¶ 95, 341 P.3d at 1065 (emphasis added).

[¶71] The district court found that "multiple intentional acts, done by Rebecca in bad faith, and with favoritism shown toward certain beneficiaries, reach the proper showing needed for her removal as trustee." The district court's "power to remove a trustee is 'rooted in equity' and the court has 'sound discretion' to make the determination whether to remove a trustee, which we will not disturb absent an abuse of discretion." *Id*. at ¶ 33, 341 P.3d at 1053 (citations omitted); *Shriners Hosps. for Children v. First Northern Bank of Wyo.*, 2016 WY 51, ¶¶ 96-97, 373 P.3d 392, 416 (Wyo. 2016). "In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did." *Hodges v. Lewis & Lewis, Inc.*, 2005 WY 134, ¶ 11, 121 P.3d 138, 143 (Wyo. 2005) (quoting *Landsiedel v. Buffalo Properties, LLC*, 2005 WY 61, ¶ 23, 112 P.3d 610, 616 (Wyo. 2005)). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." *Williams v. Williams*, 2016 WY 21, ¶ 13, 368 P.3d 539, 544 (Wyo. 2016) (quoting *Pahl v. Pahl*, 2004 WY 40, ¶ 6, 87 P.3d 1250, 1252 (Wyo. 2004)).

[¶72] Rebecca argues that her hostility toward Lori is not, by itself, sufficient cause to remove her as trustee. Hostility between a trustee and beneficiaries will generally be insufficient to justify the removal of a trustee:

> Hostility may naturally exist in trust relationships since trusts are usually created to withhold control of the trust principal from the beneficiaries. Hostility between the trustee and the beneficiaries of the trust alone is insufficient to require the removal of the trustee. To be sufficient to require removal, the hostility must interfere with the proper administration of the trust.
>
> . . . The real question in these situations is whether or not the hostility, in combination with existing circumstances, materially interferes with the administration of the trust or is likely to cause that result.

*Forbes*, 2015 WY 13, ¶ 96, 341 P.3d at 1065 (citations omitted).

[¶73] We agree that Rebecca's hostility toward Lori alone would not suffice to justify the removal of Rebecca as trustee of the MJFRT. However, that hostility sparked the conduct that ultimately was found to be a breach of her duties as trustee. We find no

abuse of discretion in this instance where, as explained in the preceding sections, the district court justifiably found that Rebecca breached her fiduciary duties of loyalty and her duty of good faith when she paid herself for undertakings that were not compensable under the trust, when she improperly spent trust monies on herself, when she called the Moncecchi note, when she delayed Lori's 2014 gift, and when she made the loan to Tamra. This conduct damaged the trust estate in that trust money was paid improperly for Rebecca's benefit and manifested Rebecca's willingness to abuse her power as trustee to benefit some beneficiaries while harming others. The district court's conclusion that Rebecca "demonstrated that she lacks the ability to fairly and impartially administer this trust going forward for the benefit of all beneficiaries" does not exceed the bounds of reason under the circumstances. The district court did not abuse its discretion when it removed Rebecca as the trustee of the MJFRT.

## IV. Did the district court incorrectly apply the burden of proof for establishing damages resulting from Rebecca's breach of fiduciary duty?

[¶74] The district court determined that the Moncecchis did not prove damages with a reasonable degree of certainty and, thus did not award damages for Rebecca's breaches of fiduciary duty. The district court held that the Moncecchis "have not met their burden of establishing the economic damages resulting from" Rebecca's breaches of her fiduciary duty. Relying upon *Schlinger v. McGhee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012), the court explained:

> 129. As to the improper restaurant charges, the court could not glean from the trial testimony (or [the Moncecchis'] exhibit 92), the actual economic damages *suffered by the trust* with respect to these charges. While it is clear to the court that trust funds were transferred to Margie's checking account and then improvidently spent by Rebecca, the total amount of the charges and the resulting loss to the trust was not established "with a reasonable degree of certainty."

> 130. Similarly, [the Moncecchis] did not meet their burden of establishing damages for Rebecca's conduct in overcharging for her administrative services. [The Moncecchis] did present credible testimony as to the reasonable value of Rebecca's bookkeeping duties, which clearly constitute the bulk of Rebecca's administrative services to the trust. However, [the Moncecchis] failed to address the reasonable value of other incidental work that Rebecca performed for the trust, such as preparing and listing her mother's residence for sale with a real estate agent. Rebecca would be entitled to claim some fees for that work as

27

the house is a trust asset, but the court should not have to guess or speculate as to the value of these services. Accordingly, the court finds that [the Moncecchis] have also failed to prove their damages for breach of fiduciary duty with a reasonable degree of certainty.

[¶75] On appeal, the Moncecchis argue that the district court should have placed the burden on Rebecca, as the trustee, to prove that payments made to her were proper distributions. In response, Rebecca and the MJFRT argue that the burden of proving economic loss was properly placed on the Moncecchis and that they failed to meet this burden. Whether the district court applied the proper legal analysis to calculate damages is an issue of law, which we review de novo. *Knight v. TCB Constr. & Design, LLC*, 2011 WY 27, ¶ 16, 248 P.3d 178, 183 (Wyo. 2011).

[¶76] *Schlinger* was a breach of contract case in which the appellants challenged the sufficiency of the evidence presented at trial on damages. We held that in order to receive damages on a breach of contract, the plaintiff "has the burden of producing sufficient evidence to prove his damages" and that those damages must be established "with a reasonable degree of certainty[.]" *Schlinger*, 2012 WY 7, ¶ 12, 268 P.3d at 268. "[A] court may not resort to speculation or conjecture in determining the proper amount to award." *Id*. (citations omitted).

[¶77] The Moncecchis argue that they had no burden to prove damages because trust cases require a different legal analysis. They contend that in trust cases the trustee bears the burden of establishing that payments made to the trustee were proper disbursements. They cite to a number of cases they claim stand for that proposition. *See, e.g.*, *In re McMillan's Estate*, 33 P.2d 369, 374 (N.M. 1934); *Davis v. Jones*, 254 F.2d 696, 699 (10th Cir. 1958), *cert. denied*, 358 U.S. 865, 79 S.Ct. 97, 3 L.Ed.2d 98 (1958); *Jicarilla Apache Nation v. United States*, 112 Fed. Cl. 274, 302-03 (2013); *White Mountain Apache Tribe of Ariz. v. United States*, 26 Cl. Ct. 446, 449 (1992), *aff'd*, 5 F.3d 1506 (Fed. Cir. 1993), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 191 (1994).

[¶78] The cases relied upon by the Moncecchis reason that because a trustee always has the duty to keep accurate accounts regarding the administration of the trust, *see* Restatement (Second) of Trusts § 172 (1957), the trustee ought to bear the burden of proving that distributions from the trust are appropriate. For example, in *Jicarilla*, the court stated: "Consistent with the common-sense notion that it is the trustee's burden to show that trust fund disbursements were authorized and otherwise proper, if a trustee fails to keep proper accounts, all doubts will be resolved against him and not in his favor." 112 Fed. Cl. at 302-03 (internal quotation marks and citation omitted). However, even those cases recognize that the beneficiary bears the initial burden of proving a loss as a result of the trustee's breach of fiduciary duty. *See Jicarilla*, 112 Fed. Cl. at 304 ("[I]t is a principle of long standing in trust law that once the beneficiary has shown a breach of the

28

trustee's duty and a resulting loss, the risk of uncertainty as to amount of the loss falls on the trustee.") (internal quotation marks and citation omitted)).

[¶79]   Rebecca and the MJFRT argue that the beneficiary seeking relief bears the burden of proving damages.  They refer to cases holding that generally a beneficiary seeking to obtain relief for a breach of trust bears the initial burden of proving damages.  Some of those cases state that the beneficiary bears the burden of proving damages and that burden remains with the beneficiary at all times.  *See, e.g.*, *SunTrust Bank v. Farrar*, 675 S.E.2d 187, 191 (Va. 2009); *Parker v. Pine*, 617 S.W.2d 536, 540 (Mo. Ct. App. 1981); *Fed. Ins. Co. v. Mertz*, 2016 WL 164618, *3 (S.D.N.Y. January 12, 2016).  Other cases enunciate a clear rule that once a prima facie case of damages has been made, the burden shifts to the trustee to establish that he acted fairly and reasonably.  *John E. Shaffer Enters. v. City of Yuma*, 904 P.2d 1252, 1255-56 (Ariz. Ct. App. 1995); *New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 182-83 (2d Cir. 1994); *Salovaara v. Eckert*, No. 94 Civ. 3430 (KMU), 1998 WL 276186, at *4 (S.D.N.Y. May 28, 1998), *aff'd*, 182 F.3d 901 (2d Cir. 1999).

[¶80]   The majority of courts agree with the latter approach and hold that there is a shift in the burden: once the beneficiary proves damages as a result of a breach of trust, the burden shifts to the trustee to show that disbursements from the trust were proper and offset the damages established by the beneficiary.

> A beneficiary seeking to obtain relief for a breach of trust must plead and prove facts which show the existence of a fiduciary duty and the failure of the trustee to perform it, and that consequently the court should grant the requested remedy.  ***If he seeks damages, a part of his burden will be proof that the breach caused him a loss. . . . If the beneficiary makes a prima facie case, the burden of contradicting it or showing a defense will shift to the trustee.***

George G. Bogert et al., *The Law of Trusts and Trustees* § 871, at 156-57 (Rev. 2d ed. 1995 & Supp. 2016) (emphasis added); *see also* 3 Austin W. Scott et al., *Scott and Ascher on Trusts* § 17.4 (4th ed. 2007); *LaMonte v. Sanwa Bank California*, 52 Cal. Rptr. 2d 861, 865 (Cal. Ct. App. 1996) ("In order to plead a cause of action for breach of fiduciary duty against a trustee, the plaintiff must show the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach; the absence of any one of these elements is fatal to the cause of action."); *Oates v. City of Lincoln*, 112 Cal. Rptr. 2d 790, 796-97 (Cal. Ct. App. 2001) (same).

[¶81]   Here, the Moncecchis sought damages and thus they bore the initial burden of proving economic loss to the trust.  They met this burden when they established that

Rebecca overpaid herself by $80,661[15] and improperly expended $1,421.59 in trust money for dining at various restaurants. The total damages to the trust is $82,082.59. At that point, the burden shifted to Rebecca to establish what, if any, amounts paid to her were proper and thus legitimately offset the damages proven by the Moncecchis. The record contains no evidence of a reasonable fee for the time Rebecca spent preparing Margie's home for sale or for the time she spent dealing with oil and gas production income. The Moncecchis met their burden of establishing the damages caused by Rebecca's breach of fiduciary duties; Rebecca did not meet her burden of contradicting that proof. We reverse that portion of the district court's ruling which concludes that the Moncecchis failed to establish damages to the MJFRT, and we remand for an award of damages consistent with this opinion.

## V. Did the district court abuse its discretion when it awarded attorney fees against Rebecca for filing a frivolous claim?

[¶82] The Moncecchis argue that the district court abused its discretion when it did not award them their attorney fees for the claims they asserted against Rebecca and the MJFRT. Rebecca and the MJFRT counter that because the Moncecchis did not move for attorney fees and never asserted that their attorney fees were an element of the damages they sought, they cannot raise the issue now. The record belies this argument. In their First Amended Complaint, the Moncecchis asserted that Wyo. Stat. Ann. § 4-10-1004 entitles them to attorney fees and they sought an award of such fees.

[¶83] The district court did award fees to the Moncecchis, finding that the counterclaim filed by Rebecca and the MJFRT which sought to collect on the Moncecchi loan was frivolous. On appeal, Rebecca and the MJFRT argue that the district court mistakenly took the filing of this counterclaim as vindictiveness on Rebecca's part and that the subsequent award of attorney fees was unjustified because the claim was not frivolous. "The question of whether there is legal authority to award attorney fees is one of law, which we review *de novo*. The final attorney fee award is, however, reviewed for abuse of discretion." *Shriners Hosps. for Children*, 2016 WY 51, ¶ 102, 373 P.3d at 417 (citations omitted).

[¶84] Wyoming follows the American rule regarding attorney fees, which provides that each party is responsible for his or her own attorney fees. *Positive Progressions*, 2015 WY 138, ¶ 29, 360 P.3d at 1016; *Thorkildsen v. Belden*, 2012 WY 8, ¶ 10, 269 P.3d 421, 424 (Wyo. 2012). "Attorney fees are recoverable under the American rule only where a

---

[15] Rebecca paid herself a total of $85,881 between 2012 and May 2014. *See supra* ¶ 62. The evidence revealed that a reasonable fee for the accounting services she provided to the trust would be between $1,560 and $2,160 per year. *See supra* ¶ 18. Taking the higher figure, a reasonable fee for those services for 2012, 2013, and through May 2014 when she stopped paying herself monthly (5/12 of 2014) totals $5,220 ($2,160 + $2,160 + 5/12 ($2,160) = $5,220). Thus, Rebecca overpaid herself in the amount of $85,881 - $5,220, which is $80,661.

contractual or statutory provision authorizes such recovery, or as a form of punitive damages when such damages can properly be awarded." *Positive Progressions*, 2015 WY 138, ¶ 29, 360 P.3d at 1016 (citing *Alexander v. Meduna*, 2002 WY 83, ¶ 49, 47 P.3d 206, 220-21 (Wyo. 2002); *Olds v. Hosford*, 354 P.2d 947, 950 (Wyo. 1960)).[16]

[¶85]  The Uniform Trust Code authorizes the payment of attorney fees and costs:

> In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

Wyo. Stat. Ann. § 4-10-1004 (LexisNexis 2015).  The district court had the statutory authority to award attorney fees as it determined "justice and equity may require."  As we explained in *Shriners Hosps. for Children*, 2016 WY 51, ¶ 108, 373 P.3d at 418 (internal citations omitted):

> Once it has been determined that authority exists to award fees and costs, a trial court has extremely broad discretion to

---

[16] W.R.C.P. 54 provides as follows:

**Rule 54. Judgment; costs.**

  . . . .
  (d)  *Costs; Attorney's Fees.*

  . . . .
  (2)  Attorney's Fees.
  (A)  When allowed by law, claims for attorney's fees and related nontaxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

  . . . .
  (D)  The court may establish special procedures by which issues relating to such fees may be resolved without extensive evidentiary hearings. . . .

We have recognized that "[p]ursuant to the language in paragraph (A), claims for attorney fees are to be made by motion unless the substantive law governing the action provides for their recovery as an element of damages to be proved at trial." *Joe's Concrete & Lumber, Inc. v. Concrete Works of Colorado, Inc.*, 2011 WY 74, ¶ 17, 252 P.3d 445, 449 (Wyo. 2011).  Accordingly, "where the parties' contract provided that legal costs were part of the damages available in the event of its breach, . . . the attorney fees fell within the substantive claim exception to F.R.C.P. 54 and were to be proven at trial, not by post-trial motion" and where a contract "provides for the recovery of fees by the prevailing party, such fees are not an element of damages to be proved at trial, but . . . requir[e] a Rule 54(d)(2) motion." *Id.*

31

rule on the amount of such an award. In reviewing the district court's determination of the amount, if any, to award the Trustees in this case, we are mindful that we have held that we will not interfere with the trial court's exercise of discretion in making such an award except upon proof that such discretion was gravely abused.

Courts interpreting provisions identical or similar to § 4-10-1004 have observed that the provision's use of the phrase "justice and equity" must guide a trial court's discretion in determining whether to award fees from a trust and the amount of any fees awarded.

*Id.* (quoting *Garwood v. Garwood*, 2010 WY 91, ¶¶ 38-39, 233 P.3d 977, 986 (Wyo. 2010)). In *Shriners*, we held that where the district court determined that the beneficiaries' actions against the trust and trustee were "taken with utter disregard" to the settlors' intentions, the district court did not abuse its discretion in awarding attorney fees. *Id.* at ¶110, 373 P.3d at 419.

[¶86] The district court found:

64. The court later questioned Rebecca as to the reasons why the trust would counterclaim on a loan that is being repaid by the Moncecchis, and the following colloquy took place:

THE COURT: Can you tell me why you took action to essentially call the loan that the Moncecchis had when they were making payments on the loan?

THE WITNESS: I said that before. I said that the reason I did that was because they had brought a lawsuit against the trust.

THE COURT: Did you believe that they had violated the terms of the loan or that they were in default somehow by doing that?

THE WITNESS: No.

THE COURT: So it was simply because they sued you?

32

THE WITNESS: Um, they sued the trust. It wasn't -- you know, it had nothing to do with me.

THE COURT: But they had been making payments to you?

THE WITNESS: They had been making payments monthly, yes, for -- they had started in 2012.

THE COURT: Prior to the lawsuit you had been receiving those payments?

THE WITNESS: Pardon me?

THE COURT: Prior to the lawsuit you had been receiving those payments, correct?

THE WITNESS: Yes.

65. Rebecca later conceded that the trust would be willing to drop its counterclaim against the Moncecchis seeking a judgment for the December 29, 2005 promissory note.

. . . .

131. Plaintiffs also established that Rebecca did not act in good faith in calling the Moncecchis' loan and bringing a frivolous counterclaim against them for repayment of this same loan which was not, by Rebecca's own admission, in default.

132. Rebecca admitted in her testimony that she called the Moncecchi loan simply because of the fact that Dino and Lori filed this lawsuit against her as trustee. (¶ 64 herein). Rebecca subsequently agreed to dismiss her counterclaim against the Moncecchis.

. . . .

Finally, the court finds that the counterclaim asserted by [Rebecca] seeking to collect the judgment on the Moncecchi loan was frivolous and entitles [Dino] to an award of attorney fees. Such award shall be limited to the reasonable amount of fees expended in defense of this counterclaim and shall be supported by affidavit.

[¶87] The district court's observation that the counterclaim was "frivolous" and was brought in bad faith was not clearly erroneous. We therefore find no abuse of discretion in the district court's determination that Rebecca and the MJFRT should be responsible for payment of the attorney fees incurred by the Moncecchis in defending against that claim, nor do we find an abuse of discretion in the district court's failure to award additional attorney fees to the Moncecchis.

## *CONCLUSION*

[¶88] The district court's conclusion that Dino did not breach his duties to FHC by not soliciting bids from competitive property management companies or by appropriating business opportunities for Spartan was not clearly erroneous. Because Dino did not breach his duties to FHC, we do not address the question of whether the district court's finding that FHC did not sustain damages was clearly erroneous. The removal of Rebecca as trustee of the MJFRT was not based on findings that were clearly erroneous. However, the district court incorrectly applied the burden of proof for establishing damages resulting from Rebecca's breach of fiduciary duty. While the initial burden of showing harm was correctly placed upon the Moncecchis, once they established overpayment to Rebecca, the burden shifted to Rebecca to establish that her disbursements were proper. The Moncecchis met their burden and demonstrated damages to the trust in the amount of $82,082.59. Rebecca failed to produce evidence regarding the value of any offsetting disbursements. Finally, the district court did not abuse its discretion or err as a matter of law when it awarded the Moncecchis attorney fees. Accordingly, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.